David M. Parker, Esq. (SBN 211078)
Gregory L. Riggs, Esq. (SBN 314022)
**PARKER & RIGGS LLP**
110 West A Street, Suite 615
San Diego, California 92101
Telephone:  (619) 233-8292
Facsimile:   (619) 233-8636
DParker@ParkerRiggs.com;
GRiggs@ParkerRiggs.com

Attorneys for Plaintiff Stewart Title Guaranty Company

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEWART TITLE GUARANTY COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DAMAGES FOR:** <br> 1) **FRAUD – INTENTIONAL MISREPRESENTATION** <br> 2) **FRAUD – CONCEALMENT** <br> 3) **PROMISSORY FRAUD** <br> 4) **CONVERSION** <br> 5) **CIVIL RICO (18 U.S.C. §1962(c);** <br> 6) **CIVIL RICO CONSPIRACY (18 U.S.C. §1962(d)).** <br><br> **DEMAND FOR JURY TRIAL: PLAINTIFF HEREBY DEMANDS TRIAL BY JURY** |

Plaintiff Stewart Title Guaranty Company ("Stewart") alleges as follows:

## PARTIES

1.     Stewart is, and at all times herein was, a Texas corporation doing business in the county of Alameda, State of California.

2.     The true names and capacities of the fictitiously named defendants, DOES 1 through 1-100, inclusive, are unknown to Stewart and it will seek leave to amend this Complaint to allege such names and capacities as soon as they are ascertained.

PARKER & RIGGS LLP

1

**COMPLAINT**

3.    Stewart is informed and believes and thereon alleges that at all times relevant herein, each of the defendants, including DOES 1 through 100, inclusive, were the sureties, principals, agents, and/or employees of each of the remaining Defendants and, in doing the things herein-alleged, were acting within the course and scope of such surety, principal, agency, and/or employment relationship.

4.    Stewart is informed and believes and thereon alleges that at all times relevant herein, each of the defendants, including DOES 1 through 100, inclusive, conspired and agreed amongst themselves to act or fail to act in the manner complained of in this Complaint and were, by engaging in such conduct, acting pursuant to and in furtherance of said conspiracy. Each of the Defendants are jointly and severally responsible and liable to Stewart for the damages alleged herein.

## JURISDICTION AND VENUE

5.    Jurisdiction in this Court is proper under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under the laws of the United States.

6.    Jurisdiction in this Court is also proper under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.    Venue is proper under 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred; and/or a substantial part of property that is subject of the action is situated within this judicial district.

## GENERAL FACTUAL ALLEGATIONS

8.    This action is brought to recover funds that were stolen pursuant to a fraudulent real estate transaction. The transaction involved a purported sale from sellers Gregory W. Alameda and Julia A. Alameda (the "Alamedas") to buyer Good Guys Ventures, LLC ("GGV"). This action is also brought to recover funds that were wrongfully taken pursuant to the sale, and to recover damages against the individuals who impersonated the Alamedas in connection with the sale of real property to GGV.

9.    Stewart is informed and believes and thereon alleges that GGV is, and at

PARKER & RIGGS LLP

2

**COMPLAINT**

all relevant times herein was, a California Limited Liability Company. Stewart further alleges that Ali Hussain ("Hussain") and Tejvinder Pal Singh Bhatia ("Bhatia") are business partners who co-founded GGV.

10.    Stewart is informed and believes and thereon alleges that the Alamedas are, and at all relevant times herein were, the record owners of vacant land in the county of Alameda, State of California.

11.    This action involves the real property commonly known as US Highway 50 W, Dublin, CA 94568, identified by Assessor's Parcel Number 985-0027-003, and more particularly described as:

> Commencing at a point on the Southwesterly line of that certain parcel of land Described as Parcel 1 in the deed from Earl W. Smith Development Organization, El Al, to W. L. Maynard and Jean S. Maynard, as recorded on Reel 3309, at Image 867, Alameda County records, said point being referred to as Station "A" in said Deed; thence from said point of commencement, South 50° 00' 00" West, 56.00 feet to the true point of beginning of this description; thence from said true point of beginning, South 50° 00' 00" West, 48.92 feet to a point on the Arc of a curve having a radius of 700.00 feet, the center of which curve bears South 14° 36' 07" West; thence Northwesterly along the arc of said curve having a Radius of 700.00 feet, through a central angle of 17° 32' 02". An arc distance of 214.22 feet; thence along the arc of a reverse curve to the right, having a radius of 120.00 feet, through a central angle of 84° 57' 21", an arc distance of 177.93 feet; thence tangent to said curve, North 02° 06'44" East, 72.35 feet; thence along the arc of a tangent curve to the right, having a Radius of 40.00 feet, through a central angle of 93° 46' 50", an arc distance of 65.47 feet; thence along the arc of a compound curve to the right, having a radius of 222.00 feet, through a central angle of 44° 06' 26" an arc distance of 170.90 feet; thence tangent to said curve, South 40° 00' 00" East, 238.99 feet to the true point of beginning
>
> (the "Property").

12.    On or around November 29, 2024, Mr. Hussain visited Redfin.com, a real estate website, and saw the Property as being listed for sale. On December 4, 2024, Messrs. Hussain and Bhatia made an offer to purchase the Property for

PARKER & RIGGS LLP

**COMPLAINT**

$600,000.00, and individuals purporting to be the Alamedas accepted the offer to purchase the Property. The same day, the parties executed a Vacant Land Purchase Agreement and Joint Escrow Instructions (the "Purchase Agreement") using Docusign. A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit 1** and incorporated herein by this reference.

13. On or about December 5, 2024, Hussain and Bhatia opened escrow with Orange Coast Title Company ("Orange Coast") with an initial deposit of $18,000.

14. On or about December 14, 2024, the parties via Docusign assigned the Purchase Agreement to GGV by executing the Assignment of Agreement Amendment (the "Purchase Agreement Assignment"). A true and correct copy of the Purchase Agreement Assignment is attached hereto as **Exhibit 2** and is incorporated herein by this reference.

15. On December 18, 2024, an individual purporting to be Gregory Alameda informed Orange Coast by email that he was undergoing cancer treatment at a hospital in Houston, Texas, and—citing the hospital's strict rules on visitors coming to the cancer ward—requested that he be allowed to use the hospital's own notary in the transaction. Orange Coast agreed to this request.

16. Stewart is informed and believes and thereon alleges that on or about December 18, 2024, Minerva Hollingsworth—a licensed notary public operating out of Houston, Texas, Notary ID 12321365—notarized the signatures of individuals purporting to be Gregory Alameda and Julia Alameda on the grant deed (the "Grant Deed") purporting to convey the Property to GGV on behalf of the Alamedas. A true and correct copy of the Grant Deed is attached hereto as **Exhibit 3** and incorporated herein by this reference.

17. On December 20, 2024, GGV deposited the remainder of its purchase funds into escrow ($584,152.60). In connection with the close of escrow, the Grant Deed was recorded on December 23, 2024, as Document Number 2024155525 of Official Records of Alameda County.

18. On December 24, 2024, Stewart issued a CLTA Standard Policy of Title Insurance to GGV LLC with a maximum liability coverage of $600,000.00 (the "Policy").

19. On or around December 23, 2024, Orange Coast disbursed $278,027.78 to an account at Fifth Third Bank held in the name of Gregory and Julia Alameda. On or around December 31, 2024, Orange Coast disbursed $290,000.00 to an account at Citibank, NA, held in the name of Gregory and Julia Alameda.

20. Stewart is informed and believes and thereon alleges that neither of the Alamedas authorized or signed the Purchase Agreement, the Purchase Agreement Assignment, or the Grant Deed. Stewart is further informed and believes and thereon alleges that individuals impersonated the Alamedas in mail, email, electronic, and telephonic communications with Orange Coast in connection with the sale of the Property.

21. In response to a claim made by GGV under the Policy, and as a result of the failure of title due to fraud by individuals who impersonated the Alamedas, on March 10, 2025, Stewart honored its obligations under the Policy and paid the loss to GGV in the amount of $600,000.00.

22. Messrs. Hussain and Bhatia, in their individual capacities and as owners of GGV, executed an Assignment of Claims and Rights ("Assignment of Rights") whereby they assigned to Stewart all rights, claims, demands, causes of action, and /or defenses of any kind and nature for loss, injury, or damage sustained by Good Guys in connection with, *inter alia*, the sale of the Property.

23. Having paid GGV damages under the Title Policy, Stewart stands in the shoes of GGV and by virtue of assignment has all the rights of GGV including the right to recover damages sustained in connection with the fraudulent sale of the Property.

/ / /

/ / /

PARKER & RIGGS LLP

**COMPLAINT**

## FIRST CAUSE OF ACTION
### (Fraud – Intentional Misrepresentation)
### Against Does 1 through 100, Inclusive

24.     Stewart realleges and incorporates by this reference paragraphs 1 through 23, inclusive, as though set forth in full at this point.

25.      Prior to GGV's purchase of the Property, Defendants represented that they were Gregory Alameda in their oral, written and mailed communications with Orange Coast.  Defendants appropriated the identities of the Alamedas and pretended to be them.  Defendants represented that they were the owners of the Property. Defendants represented that the Alamedas were offering the Property for sale. Defendants used Docusign to execute various documents in connection with the sale of the Property in the names of Gregory and Julia Alameda.  Defendants represented that they had the power and authority to convey title to the Property to GGV in exchange for GGV's purchase money proceeds. Defendants forged the signatures of the Alamedas on the Grant Deed.

26.     Each of Defendants' representations was a false representation of material fact.

27.     Stewart is informed and believes and thereon alleges that GGV was ignorant of the falsity of Defendants' representations.

28.     Stewart is informed and believes and thereon alleges that Defendants made these false representations of material fact to induce GGV to rely upon them and to induce GGV to believe it was purchasing the Property from the true owners, the Alamedas.

29.     Stewart is informed and believes and thereon alleges that GGV reasonably relied upon Defendants' false representations, entered into the Purchase Agreement, opened escrow, made its deposit, and paid the full amount called for by the Purchase Agreement all on the good faith belief that GGV was purchasing the Property from the true owners: Gregory and Julia Alameda.

30.     Stewart is informed and believes and thereon alleges that Defendants

PARKER & RIGGS LLP

6

**COMPLAINT**

made these false representations for the purpose of enriching themselves and depriving GGV of the purchase money it paid for the Property.

31. Stewart is informed and believes and thereon alleges that GGV would never have purchased the Property if it had knowledge of Defendants' fraudulent scheme.

32. As a result of Defendants' intentional misrepresentations, GGV has been deprived of property and property rights, and has been damaged by the loss of the purchase monies paid without receiving title to the Property.

33. Stewart—having paid the loss of $600,000.00 to GGV under the Policy and as an assignee of GGV's claims—is authorized to bring this action for recovery in connection with the fraudulent sale of the Property.

34. Stewart, as assignee, has been damaged in an amount of no less than $600,000.00, and has sustained related damages, including having to bring this action to recover the funds that were stolen from its insured, and has incurred attorneys' fees and costs, and will incur additional expenses. Stewart is entitled to an award of attorneys' fees under the doctrine of the tort of another.

35. Stewart is informed and believes and thereon alleges that in doing the things herein alleged, Defendants acted willfully and with the intent to cause injury to GGV and are therefore guilty of malice, oppression, fraud and/or acting with conscious disregard of GGV' rights, as to justify an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Fraud – Concealment)
### Against Does 1 through 100, Inclusive

36. Stewart realleges and incorporates by this reference paragraphs 1 through 35, inclusive, as though set forth in full at this point.

37. In addition to Defendants' affirmative misrepresentations alleged above, Defendants are liable for fraudulent concealment. To that end, in making the affirmative representations alleged herein, Defendants concealed or suppressed material facts by concealing and failing to disclose material facts, failing to disclose

PARKER & RIGGS LLP

7

**COMPLAINT**

that they were not in fact the Alameda, failing to disclose that they had no right, title, or interest in the Property (and forged signatures on documents to perpetuate this lie), and failing to disclose that they lacked the power and authority to convey the Property to GGV on behalf of the Alamedas.

38.     Defendants concealed these facts with the intent to defraud GGV.  GGV was unaware of the true facts and would not have purchased the Property had it known of the concealed or suppressed facts.  As a result of the concealment, GGV has been deprived of property and property rights, and has been damaged by the loss of the purchase monies paid without receiving title to the Property.

39.     Stewart—having paid out $600,000.00 to GGV under the Policy and as an assignee of GGV's claims—stands in the shoes of GGV, and is authorized to bring this action for recovery in connection with the fraudulent sale of the Property.

40.     Stewart, as assignee, has been damaged in an amount of no less than $600,000.00, and has sustained related damages, including having to bring this action to recover the funds that were stolen from its insured, and has incurred attorneys fees and costs, and will incur additional expenses. Stewart is entitled to an award of attorneys fees under the doctrine of the tort of another.

41.     Stewart is informed and believes and thereon alleges that in doing the things herein alleged, Defendants acted willfully and with the intent to cause injury to GGV and are therefore guilty of malice, oppression, fraud and/or acting with conscious disregard of GGV' rights, as to justify an award of punitive damages.  As assignee of GGV, Stewart is entitled to recover this for itself.

### THIRD CAUSE OF ACTION
**(Promissory Fraud)**
**Against Does 1 through 100, Inclusive**

42.     Stewart realleges and incorporates by this reference paragraphs 1 through 41, inclusive, as though set forth in full at this point.

43.     In addition to Defendants' affirmative misrepresentations alleged above, Defendants are liable for promissory fraud.  To that end, in making the affirmative

PARKER & RIGGS LLP

8

**COMPLAINT**

representations alleged herein, Defendants falsely represented themselves as the Alamedas to fraudulently enter into the Purchase Agreement purporting to sell and convey the Property to GGV with no intention of performing.  The intention to not perform existed at the time the promise was made, as Defendants did not in fact have any right, title, or interest in the Property.  Defendants intended to induce GGV to enter into this fraudulent real estate transaction, and the reliance by GGV was reasonable.  Defendants accepted the purchase monies of GGV but did not convey title of the Property to it.  As a result of the promissory fraud, GGV has been deprived of property and property rights, and has been damaged by the loss of the purchase monies paid without receiving title to the Property.

44.     Stewart—having paid out $600,000.00 to GGV under the Policy and as an assignee of GGV's claims—is authorized to bring this action for recovery in connection with the fraudulent sale of the Property.

45.     Stewart, as assignee, has been damaged in an amount of no less than $600,000.00, and has sustained related damages, including having to bring this action to recover the funds that were stolen from its insured, and has incurred attorneys' fees and costs, and will incur additional expenses.  Stewart is entitled to an award of attorneys' fees under the doctrine of the tort of another.

46.     Stewart is informed and believes and thereon alleges that in doing the things herein alleged, Defendants acted willfully and with the intent to cause injury to GGV and are therefore guilty of malice, oppression, fraud and/or acting with conscious disregard of GGV's rights, so as to justify an award of punitive damages. As assignee of GGV, Stewart is entitled to recover this for itself.

### FOURTH CAUSE OF ACTION
**(Conversion)**
**Against Does 1 through 100, Inclusive**

47.     Stewart realleges and incorporates by this reference paragraphs 1 through 46, inclusive, as though set forth in full at this point.

48.     Under the Purchase Agreement and Purchase Agreement Assignment,

PARKER & RIGGS LLP

9

**COMPLAINT**

GGV agreed to purchase and Defendants—masquerading as if they were Gregory and Julia Alameda—agreed to sell the Property.

49.    Stewart is informed and believes and thereon alleges that when Defendants made the material misrepresentations alleged above, in furtherance of their scheme to commit fraud and deceit, they knew them to be false, and made these misrepresentations to induce GGV to rely on them or made these misrepresentations with the expectation that GGV would so act.    Acting in reliance on these misrepresentations, GGV entered into the Purchase Agreement and Purchase Agreement Assignment, then $18,000 was deposited into escrow on or about December 5, 2024.  On December 20, 2024, an additional $584,152.60 was deposited into escrow for GGV's purchase. As assignee of GGV, Stewart is entitled to recover damages sustained by GGV for itself.

**FIFTH CAUSE OF ACTION**
**CIVIL RICO (18 U.S.C. §1962(c)**
**Against Does 1 through 100, inclusive**

50.    Stewart realleges and incorporates by this reference paragraphs 1 through 49, inclusive, as though set forth in full at this point.

51.    Plaintiffs and Defendants are all "persons" as that term is defined in 18 U.S.C. § 1961(3).

52.    Defendants DOES 1 through 100, including all of their employees and agents (herein referred to as the "Enterprise Defendants"), formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), the "Real Estate Scheme."

53.    The Real Estate Scheme is an ongoing organization consisting of a variety of legal "persons" that associated for common and shared purposes, including: (a) to engage in real estate fraud by marketing for sale certain real property of which Enterprise Defendants lack any right, title, interest, or authority to convey; (b) to use false identification documents and fake email accounts to impersonate owners of real property; (c) to forge signatures on real property instruments; (d) to open bank accounts in the names of owners of real estate to receive the proceeds of

**COMPLAINT**

PARKER & RIGGS LLP

fictitious land sales; and (e) to conceal the true nature of the Real Estate Scheme, the real identities of the perpetrators, and the criminal purpose behind the fraudulent enterprise.

54.    The Enterprise Defendants coordinated with one another to implement and conceal the Real Estate Scheme.  Each Enterprise Defendant operated, managed, and/or participated in the Real Estate Scheme, and the Enterprise Defendants worked together to execute the fraud.

55.    The Real Estate Scheme has functioned as a continuing enterprise since at least November 2024, when owner of GGV visited Redfin.com, a Real Estate website, and saw that Enterprise Defendants (impersonating the true owners) had falsely listed the Property for sale.

56.    The goal of the Real Estate Scheme was to impersonate the owners of real estate in order to order to defraud prospective real property buyers of their purchase monies spent in connection with fictitious land sales.

57.    GGV relied on numerous lies and misrepresentations by the Enterprise Defendants (including the impersonation of the Alamedas) in deciding to purchase the Property, to GGV's detriment.

58.    The Enterprise Defendants necessarily used the mail and wires to perpetrate the Real Estate Scheme.  For example, Enterprise Defendants falsely held themselves out to be the owners of the Property using electronic wire communications, Enterprise Defendants falsely listed their Property for sale on a real estate website, Enterprise Defendants used Docusign software to provide forged electronic signatures on documents in connection with the marketing and sale of the Property;  Enterprise Defendants used the mail to send and receive documents with forged signatures relating to the sale of the Property; and Enterprise Defendants provided verbal authorization over the phone to Orange Coast to release the purchase money funds to Enterprise Defendants. In addition, Enterprise Defendants knowingly used the identification documents of the Alamedas, without lawful authority, with the

PARKER & RIGGS LLP

11

**COMPLAINT**

intent to engage in the Real Estate Fraud scheme. Defendants did so in connection with this and other real properties. This constitutes a pattern of racketeering activity by fraud and related activity in connection with identification documents in violation of 18 U.S.C. § 1029, by mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.

59. The Real Estate Scheme also has a strong nexus to interstate commerce. In order to execute the Real Estate Scheme, Enterprise Defendants listed real property for sale in the state of California, then used a notary public in Harris County, Texas to notarize the forged signatures of Gregory and Julia Alameda on the Grant Deed. Stewart is informed and believes and thereon alleges that Enterprise Defendants have bank accounts across the United States, including Texas, and that the stolen real estate purchase funds were illegally wired across state lines into these accounts. As a result, the Real Estate Scheme, by definition, involves interstate commerce.

60. The Enterprise Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused GGV to suffer substantial injury because the Enterprise Defendants' pattern of racketeering activity fraudulently induced GGV to enter into the Purchase Agreement and caused them to lose $600,000.00 in purchase money funds that would not otherwise have been incurred, as alleged herein above.

61. The Real Estate Scheme's racketeering activity was fraudulently concealed from GGV as alleged herein above. For example, Enterprise Defendants failed to disclose that they were not in fact Gregory Alameda in their electronic and telephonic communications, failed to disclose that they had no right, title, or interest in the Property (and forged signatures on documents to perpetuate this lie), and failed to disclose that they lacked the power and authority to convey the Property to GGV on behalf of Gregory and Julia Alameda. Enterprise Defendants concealed these facts with the intent to defraud GGV. GGV was unaware of the truth of these facts and would not have purchased the Property had it known of the concealed or suppressed facts. As a result of the concealment, GGV has been deprived of property

PARKER & RIGGS LLP

12

**COMPLAINT**

and property rights, and has been damaged by the loss of the purchase monies paid without receiving title to the Property.

62.     Stewart is informed and believes and hereon alleges that GGV is not the only victim of fraud committed by the Enterprise Defendants, and that Enterprise Defendants have engaged in a continuing enterprise to defraud other prospective real estate investors.

63.     These misrepresentations of fact made to GGV in writing and by telephone are additional predicate acts of mail and wire fraud performed by and in furtherance of the Real Estate Scheme.  GGV (including through escrow holder Orange Title in its capacity as escrow agent) relied on all of these fraudulent representations and omission to its own detriment and financial injury.

64.     As a direct and proximate result of Enterprise Defendants' unlawful racketeering activity, Stewart was forced to pay a loss of $600,000.00 to cover the losses suffered by GGV in connection with the Real Estate Scheme.  Stewart, as assignee to GGV's claims against Enterprise Defendants, has been damaged in an amount of no less than $600,000.00.  Under the provisions of 18 U.S.C. § 1964(c), the Enterprise Defendants are jointly and severally liable to Stewart for three times the damages that Stewart has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION
**CIVIL RICO Conspiracy 18 U.S.C. §1962(d)**
**Against Does 1 through 100, Inclusive**

65.     Stewart realleges and incorporates by reference paragraphs 1 through 64, inclusive, as though set forth in full at this point.

66.     The Enterprise Defendants formed an agreement to violate 18 U.S.C. § 1962(c).  Each Enterprise Defendant knew of the Real Estate Scheme's conspiracy to defraud GGV of $600,000.00 by impersonating the owners of real property with the use of false identification documents and fake email accounts, forging signatures on real property instruments, and other related acts of fraud and deceit alleged herein

PARKER & RIGGS LLP

13

**COMPLAINT**

above.

67.    Each Enterprise Defendant agreed to join this conspiracy, and each agreed to commit, facilitate, or participate in a pattern of racketeering activity in furtherance of the conspiracy.

68.    During the conspiracy's existence, each of the Enterprise Defendants agreed to the commission of an indefinite stream of predicate acts in furtherance of the Real Estate Scheme.

69.    The Enterprise Defendants agreed to and did commit multiple instances of mail and wire fraud in furtherance of the conspiracy by mailing and wiring fraudulent real estate instruments, contracts and related amendments, and other documents to Orange Coast (who acted as escrow agent for GGV).  The Enterprise Defendants also devised the scheme, used false identification documents to impersonate the sellers of real estate, forged signatures on real estate instruments (including the Grant Deed), and concealed the Real Estate Scheme from GGV and its agents in written and oral communications through the mail, email, and telephone.

70.    As a direct and proximate result of the Enterprise Defendants' unlawful racketeering activity, Stewart was forced to pay out a loss of $600,000.00 to cover the losses suffered by GGV in connection with the Real Estate Scheme.  Stewart, as assignee of GGV's claims against Enterprise Defendants, has been damaged in an amount of no less than $600,000.00.  Under the provisions of 18 U.S.C. § 1964(c), the Enterprise Defendants are jointly and severally liable to Stewart for three times the damages that Stewart has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Stewart Guaranty Company prays for judgment as follows:

**On the First Cause of Action for Fraud – Intentional Misrepresentation:**

a.    For actual, compensatory, consequential, incidental, and special damages in an amount in excess of $600,000.00 according to proof;

b.      For exemplary or punitive damages;

c.      For pre-judgment and post-judgment interest as allowed by law and/or pursuant to contract.

**On the Second Cause of Action for Fraud – Concealment:**

a.      For actual, compensatory, consequential, incidental, and special damages in an amount in excess of $600,000.00 according to proof;

b.      For exemplary or punitive damages;

c.      For pre-judgment and post-judgment interest as allowed by law and/or pursuant to contract.

**On the Third Cause of Action for Promissory Fraud:**

a.      For actual, compensatory, consequential, incidental, and special damages in an amount in excess of $600,000.00 according to proof;

b.      For exemplary or punitive damages;

c.      For pre-judgment and post-judgment interest as allowed by law and/or pursuant to contract.

**On the Fourth Cause of Action for Conversion:**

a.      For actual, compensatory, consequential, incidental, and special damages in an amount in excess of $600,000.00 according to proof;

b.      For exemplary or punitive damages;

c.      For pre-judgment and post-judgment interest as allowed by law and/or pursuant to contract.

**On the Fifth Cause of Action for Civil Rico (18 U.S.C. §1962(c)):**

a.      For general and special damages in an amount to be proven at trial;

b.      For mandatory treble damages;

c.      For reasonable attorneys' fees; and

d.      For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

/ / /

**On the Sixth Cause of Action for Civil Rico Conspiracy (18 U.S.C. §1962(d)):**

    a.    For general and special damages in an amount to be proven at trial;

    b.    For mandatory treble damages;

    c.    For reasonable attorneys' fees; and

    d.    For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

**On All Causes of Action:**

    a.    For all costs incurred by Stewart to date and to be incurred by Stewart hereafter in connection with this action;

    b.    For prejudgment interest; and

    c.    For such other and further relief as the Court deems just.

PARKER &amp; RIGGS LLP

Dated: July 7, 2026        By:   /s/  David M. Parker, Esq.
                        David M. Parker, Esq.
                        Gregory L. Riggs, Esq.
                        Attorneys for Plaintiff Stewart Title Guaranty Company

PARKER & RIGGS LLP

**COMPLAINT**

# EXHIBIT 1

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

**CALIFORNIA ASSOCIATION OF REALTORS®**

# VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS
### (C.A.R. FORM VLPA, Revised 7/24)

Date Prepared: **December 4, 2024**

**1. OFFER:**

   **A.** THIS IS AN OFFER FROM **Ali Hussain, Tejvinder Bhatia** ("Buyer").
   [X] Individual(s), [ ] A Corporation, [ ] A Partnership, [ ] An LLC, [ ] Other _____ .

   **B.** THE PROPERTY to be acquired is **US Highway 50**, situated
   in **Dublin** (City), **Alameda** (County), California, **94568** (Zip Code),
   Assessor's Parcel No(s). **985-27-3** ("Property").
   Further Described As _____ .
   **(Postal/Mailing address may be different from city jurisdiction. Buyer is advised to investigate.)**

   **C.** THE TERMS OF THE PURCHASE ARE SPECIFIED BELOW AND ON THE FOLLOWING PAGES.

   **D.** Buyer and Seller are referred to herein as the "Parties." Brokers and Agents are **not** Parties to this Agreement.

**2. AGENCY:**

   **A.** DISCLOSURE: The Parties each acknowledge receipt of a "Disclosure Regarding Real Estate Agency Relationship" (C.A.R. Form AD) if represented by a real estate licensee. Buyer's Agent is not legally required to give to Seller's Agent the AD form Signed by Buyer. Seller's Agent is not legally obligated to give to Buyer's Agent the AD form Signed by Seller.

   **B.** CONFIRMATION: The following agency relationships are here confirmed for this transaction.

   Seller's Brokerage Firm **WR Properties** License Number **01248834**
   Is the broker of (check one): [X] the Seller; or [ ] both the Buyer and Seller (Dual Agent).
   Seller's Agent **Jeffrey Carter** License Number **01238627**
   Is (check one): [X] the Seller's Agent (Salesperson or broker associate); or [ ] both the Buyer's and Seller's Agent (Dual Agent).
   Buyer's Brokerage Firm **Redfin** License Number **01521930**
   Is the broker of (check one): [X] the Buyer; or [ ] both the Buyer and Seller (Dual Agent).
   Buyer's Agent **Zumana Calcuttawala** License Number **01960845**
   Is (check one): [X] the Buyer's Agent (Salesperson or broker associate); or [ ] both the Buyer's and Seller's Agent (Dual Agent).

   **C.** [ ] More than one Brokerage represents [ ] Seller, [ ] Buyer. See, Additional Broker Acknowledgement (C.A.R. Form ABA).

   **D.** POTENTIALLY COMPETING BUYERS AND SELLERS: The Parties each acknowledge receipt of a [X] "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

**3. TERMS OF PURCHASE AND ALLOCATION OF COSTS:** The items in this paragraph are contractual terms of the Agreement. Referenced paragraphs provide further explanation. This form is 17 pages. The Parties are advised to read all 17 pages.

| | Para # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| A | 5, 5B (cash) | Purchase Price | $ 600,000.00 | [X] All Cash |
| B | | Close Of Escrow (COE) | [X] 19 Days after Acceptance OR [ ] on _____ (date) | |
| C | 40A | Expiration of Offer | 3 calendar days after all Buyer Signature(s) or **12/04/2024** (date) at 5PM or **5** [ ] AM/ [X] PM | |
| D(1) | 5A(1) | Initial Deposit Amount | $ **18,000.00** ( **3.00** % of purchase price) (% number above is for calculation purposes and is not a contractual term) | within 3 (or **1** ) business days after Acceptance by wire transfer OR [ ] |
| D(2) | 5A(2) | [ ] Increased Deposit (Money placed into escrow after the initial deposit. Use form DID at time increased deposit is made.) | $ _____ ( ____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | Upon removal of all contingencies OR [ ] _____ (date) OR [ ] _____ |
| E(1) | 5C(1) | Loan Amount(s): First Interest Rate  Points | $ _____ ( ____ % of purchase price) Fixed rate or [ ] Initial adjustable rate • not to exceed ____ % • Buyer to pay up to ____ points to obtain rate above | Conventional or, if checked, [ ] Seller Financing [ ] Assumed Financing [ ] Subject To Financing [ ] Other: _____ |
| E(2) | 5C(2) | Additional Financed Amount Interest Rate  Points | $ _____ ( ____ % of purchase price) Fixed rate or [ ] Initial adjustable rate • not to exceed ____ % • Buyer to pay up to ____ points to obtain rate above | Conventional or, if checked, [ ] Seller Financing [ ] Assumed Financing [ ] Subject To Financing [ ] Other: _____ |
| E(3) | 7A | Intended Use | Investment OR [ ] _____ | |
| F | 5D | Balance of Down Payment | $ **582,000.00** | |
| | | PURCHASE PRICE TOTAL | $ **600,000.00** | |

© 2024, California Association of REALTORS®, Inc.

VLPA REVISED 7/24 (PAGE 1 OF 17)

Buyer's Initials **AH** / **TB**   Seller's Initials **GWA** / **JWA**

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 1 OF 17)**

Redfin, 2033 Gateway Pl #110 San Jose CA 95110    Phone: 4089410998    Fax:    Us Highway 50,
Zumana Calcuttawala    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com

At Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: **US Highway 50, Dublin, CA  94568**  Date: **December 4, 2024**

| | Para # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| G(1) | 5E | Seller Credit, if any, to Buyer | ☐ $ _____ (_____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | Seller credit to be applied to closing costs OR ☐ Other: _____ |
| G(2) | | ADDITIONAL FINANCE TERMS: _____ | | |
| G(3) | 21 | ☒ Seller agrees to pay the obligation of Buyer to compensate Buyer's Broker under a separate agreement (C.A.R. Form SPBB attached). | | |
| H(1) | 5B | Verification of All Cash (sufficient funds) | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| H(2) | 6A | Verification of Down Payment and Closing Costs | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| H(3) | 6B | Verification of Loan Application | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | ☐ Prequalification ☐ Preapproval ☐ Fully underwritten preapproval |
| I | | Intentionally Left Blank | | |
| J | 19 | Final Verification of Condition | 5 (or _____) Days prior to COE | |
| K | 26 | Assignment Request | 17 (or _____) Days after Acceptance | |
| L | | CONTINGENCIES | TIME TO REMOVE CONTINGENCIES | CONTINGENCY REMOVED |
| L(1) | 8A | Loan(s) | 17 (or _____) Days after Acceptance | ☒ No loan contingency |
| L(2) | 8B | Appraisal: Appraisal contingency based upon appraised value at a minimum of purchase price or ☐ $ _____ | 17 (or _____) Days after Acceptance | ☒ No appraisal contingency Removal of appraisal contingency does not eliminate appraisal cancellation rights in FVAC. |
| L(3) | 8C | ☐ Purchase of Manufactured Home Buyer has (or ☐ has not) entered into contract to purchase a personal property manufactured home | 17 (or _____) Days after Acceptance ☐ Shall remain in effect until the Close Of Escrow of the Property | REMOVAL OR WAIVER OF CONTINGENCY: Any contingency in L(1)-L(10) may be removed or waived by checking the applicable box above or attaching a Contingency Removal (C.A.R. Form CR-B) and checking the applicable box therein. Removal or Waiver at time of offer is against Agent advice. See paragraph 8K. |
| L(4) | 8D | ☐ Construction Loan Financing A draw from the construction loan will not (or ☐ will) be used to finance the Property | 17 (or _____) Days after Acceptance | |
| L(5) | 8E, 15 | Investigation of Property | 17 (or _____) Days after Acceptance | |
| | | Informational Access to Property Buyer's right to access the Property for informational purposes only is **NOT** a contingency and does **NOT** create additional cancellation rights for Buyer. | 17 (or _____) Days after Acceptance | |
| L(6) | 8F | Insurance | 17 (or _____) Days after Acceptance | ☒ CR-B attached |
| L(7) | 8G, 17A | Review of Seller Documents | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| L(8) | 8H, 16A | Preliminary ("Title") Report | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| L(9) | 8I, 11E | Common Interest Disclosures Per Civil Code § 4525 or this Agreement | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| L(10) | 8J, 9B(2) | Review of leased or liened items (E.g. solar panels or propane tanks) | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| L(11) | 8M | Sale of Buyer's Property Sale of Buyer's property is not a contingency, UNLESS checked here: ☐ C.A.R. Form COP attached | | |
| M | | Possession | Time for Performance | Additional Terms |
| M | 3R | Vacant Lot Delivery ☐ Lease/tenant in place | Upon notice of recordation On COE Date | Property to be delivered subject to tenant rights, except _____ . |
| N | | Documents/Fees/Compliance | Time for Performance | Additional Terms |
| N(1) | 17A | Seller Delivery of Documents | 7 (or _____) Days after Acceptance | |
| N(2) | 22B | Sign and return Escrow Holder General Provisions, Supplemental Instructions | 5 (or _____) Days after receipt | |
| N(3) | 11E(2) | Time to pay fees for ordering HOA Documents | 3 (or _____) Days after Acceptance | |
| N(4) | 36 | Evidence of representative authority | 3 Days after Acceptance | |

VLPA REVISED 7/24 (PAGE 2 OF 17)    Buyer's Initials  __AH__ / __TB__   Seller's Initials  __GWa__ , __Jala__

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 2 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com    Us Highway 50,

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA 94568* _____ Date: *December 4, 2024*

| | | | |
|---|---|---|---|
| **O** | | **Intentionally Left Blank** | |
| **P** | **Items Included and Excluded** | | |
| **P(1)** | 9 | **Items Included -** All items specified in Paragraph 9B are included and the following, if checked: ☐ _____ . ☐ _____ . ☐ _____ . | |
| **P(2)** | 9 | **Excluded Items:** ☐ _____ ; ☐ _____ ; ☐ _____ ; | |

| **Q** | **Allocation of Costs** | | | |
|---|---|---|---|---|
| | **Para #** | **Item Description** | **Who Pays** (if Both is checked, cost to be split equally unless Otherwise Agreed) | **Additional Terms** |
| **Q(1)** | | Natural Hazard Zone Disclosure Report, including tax information | ☐ Buyer ☒ Seller ☐ Both _____ <br> ☐ Provided by: _____ | ☐ Environmental _____ <br> ☐ Other _____ |
| **Q(2)** | 15B(1)(D) | Environmental Survey (Phase I) | ☐ Buyer ☒ Seller ☐ Both _____ | |
| **Q(3)** | 10 | Gov't Point of Sale Requirements **Inspections and reports** | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(4)** | 22B | Escrow Fees | ☒ Buyer ☐ Seller ☐ Both _____ <br> ☐ Each to pay their own fees | Escrow Holder: _____ <br> _____ |
| **Q(5)** | 16 | Owner's title insurance policy | ☒ Buyer ☐ Seller ☐ Both _____ | Title Company (If different from Escrow Holder): _____ |
| **Q(6)** | | Buyer's Lender title insurance policy | Buyer | Unless Otherwise Agreed, Buyer shall purchase any title insurance policy insuring Buyer's lender. |
| **Q(7)** | | County transfer tax, fees | ☐ Buyer ☒ Seller ☐ Both _____ | |
| **Q(8)** | | City transfer tax, fees | ☐ Buyer ☒ Seller ☐ Both _____ | |
| **Q(9)** | 11E(2) | HOA fee for preparing disclosures | Seller | |
| **Q(10)** | | HOA certification fee | Buyer | |
| **Q(11)** | | HOA transfer fees | ☐ Buyer ☐ Seller ☐ Both _____ | Unless Otherwise Agreed, Seller shall pay for separate HOA move-out fee and Buyer shall pay for separate move-in fee. Applies if separately billed or itemized with cost in transfer fee. |
| **Q(12)** | | Private transfer fees | Seller, or if checked, ☐ Buyer ☐ Both _____ | |
| **Q(13)** | | (A) _____ Reports <br> (B) _____ Reports | ☐ Buyer ☐ Seller ☐ Both _____ <br> ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(14)** | | (A) _____ fees/costs <br> (B) _____ fees/costs | ☐ Buyer ☐ Seller ☐ Both _____ <br> ☐ Buyer ☐ Seller ☐ Both _____ | |
| **R** | 12 | **Additional Tenancy Documents** ☐ Income and Expense Statements ☐ Tenant Estoppel Certificate | | |
| **S** | | **OTHER TERMS:** _____ | | |

**4. PROPERTY ADDENDA AND ADVISORIES:** (check all that apply)

**A. PROPERTY TYPE ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:
☐ Probate Agreement Purchase Addendum (C.A.R. Form PA-PA)
☐ Residential Units Purchase Addendum (C.A.R. Form RU-PA)
☐ Other _____

**B. OTHER ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:
☐ Addendum # _____ (C.A.R. Form ADM)      ☐ Short Sale Addendum (C.A.R. Form SSA)
☐ Back Up Offer Addendum (C.A.R. Form BUO)   ☐ Court Confirmation Addendum (C.A.R. Form CCA)
☐ Assumed Financing Addendum (C.A.R. Form AFA)
☐ Septic, Well, Property Monument and Propane Addendum (C.A.R. Form SWPI)
☐ Buyer Intent to Exchange Addendum (C.A.R. Form BXA)  ☐ Seller Intent to Exchange Addendum (C.A.R. Form SXA)
☐ Other _____                       ☐ Other _____

VLPA REVISED 7/24 (PAGE 3 OF 17)    Buyer's Initials  / [TB]    Seller's Initials

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 3 OF 17)**

Al Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E
Property Address: *US Highway 50, Dublin, CA  94568* _____ Date: *December 4, 2024*

   **C. BUYER AND SELLER ADVISORIES: (Note: All Advisories below are provided for reference purposes only and are not intended to be incorporated into this Agreement.)**

     [X] Buyer's Vacant Land Additional Investigation Advisory (C.A.R. Form BVLIA)
     [X] Fair Housing and Discrimination Advisory (C.A.R. Form FHDA)
     [X] Wire Fraud Advisory (C.A.R. Form WFA)        [X] Cal. Consumer Privacy Act Advisory (C.A.R. Form CCPA)
            (Parties may also receive a privacy disclosure from their own Agent.)

     [ ] Wildfire Disaster Advisory (C.A.R. Form WFDA)     [ ] Statewide Buyer and Seller Advisory (C.A.R. Form SBSA)
     [ ] Trust Advisory (C.A.R. Form TA)             [ ] Short Sale Information and Advisory (C.A.R. Form SSIA)
     [ ] REO Advisory (C.A.R. Form REO)           [ ] Probate Advisory (C.A.R. Form PA)
     [ ] Other _____      [ ] Other _____

**5. ADDITIONAL TERMS AFFECTING PURCHASE PRICE:** Buyer represents that funds will be good when deposited with Escrow Holder.

   **A. DEPOSIT:**

     (1) **INITIAL DEPOSIT:** Buyer shall deliver deposit directly to Escrow Holder. If a method other than wire transfer is specified in **paragraph 3D(1)** and such method is unacceptable to Escrow Holder, then upon notice from Escrow Holder, delivery shall be by wire transfer.

     (2) **INCREASED DEPOSIT:** Increased deposit specified in **paragraph 3D(2)** to be delivered to Escrow Holder in the same manner as the Initial Deposit. If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount by signing a new liquidated damages clause (C.A.R. Form DID) at the time the increased deposit is delivered to Escrow Holder.

     (3) **RETENTION OF DEPOSIT: Paragraph 36, if initialed by all Parties or otherwise incorporated into this Agreement, specifies a remedy for Buyer's default. Buyer and Seller are advised to consult with a qualified California real estate attorney: (i) Before adding any other clause specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase. Any such clause shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code; and (ii) Regarding possible liability and remedies if Buyer fails to deliver the deposit.**

   **B. ALL CASH OFFER:** If an all cash offer is specified in **paragraph 3A**, no loan is needed to purchase the Property. This Agreement is NOT contingent on Buyer obtaining a loan. Buyer shall, within the time specified in **paragraph 3H(1)**, Deliver written verification of funds sufficient for the purchase price and closing costs.

   **C. LOAN(S):**

     (1) **FIRST LOAN:** This loan will provide for conventional financing **UNLESS** Seller Financing (C.A.R. Form SFA), Assumed Financing, Subject to Financing, or Other is checked in **paragraph 3E(1)**.

     (2) **ADDITIONAL FINANCED AMOUNT:** If an additional financed amount is specified in **paragraph 3E(2)**, that amount will provide for conventional financing UNLESS Seller Financing (C.A.R. Form SFA), Assumed Financing, Subject To Financing, or Other is checked in **paragraph 3E(2)**.

     (3) **BUYER'S LOAN STATUS:** Buyer authorizes Seller and Seller's Authorized Agent to contact Buyer's lender(s) to determine the status of any Buyer's loan specified in **paragraph 3E**, or any alternate loan Buyer pursues, whether or not a contingency of this Agreement. If the contact information for Buyer's lender(s) is different from that provided under the terms of **paragraph 6B**, Buyer shall Deliver the updated contact information within 1 Day of Seller's request.

     (4) **ASSUMED OR SUBJECT TO FINANCING:** Seller represents that Seller is not delinquent on any payments due on any loans. If the Property is acquired subject to an existing loan, Buyer and Seller are advised to consult with legal counsel regarding the ability of an existing lender to call the loan due, and the consequences thereof.

   **D. BALANCE OF PURCHASE PRICE (DOWN PAYMENT, paragraph 3F)(including all-cash funds)** to be deposited with Escrow Holder pursuant to Escrow Holder instructions.

   **E. LIMITS ON CREDITS TO BUYER:** Any credit to Buyer as specified in **paragraph 3G(1)** or Otherwise Agreed, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender, if any, and made at Close Of Escrow. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then **(i)** the Contractual Credit from Seller shall be reduced to the Lender Allowable Credit, and **(ii)** in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

**6. ADDITIONAL FINANCING TERMS:**

   **A. VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Written verification of Buyer's down payment and closing costs, within the time specified **in paragraph 3H(2)** may be made by Buyer or Buyer's lender or loan broker pursuant to **paragraph 6B**.

   **B. VERIFICATION OF LOAN APPLICATIONS:** Buyer shall Deliver to Seller, within the time specified in **paragraph 3H(3)** a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in **paragraph 3E**. If any loan specified in **paragraph 3E** is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate.

   **C. BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including, but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price, and to sell to Buyer in reliance on Buyer's specified financing. Buyer shall pursue the financing specified in this Agreement, even if Buyer also elects to pursue an alternative form of financing. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in this Agreement but shall not interfere with closing at the purchase price on the COE date **(paragraph 3B)** even if based upon alternate financing. Buyer's inability to obtain alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.

**7. CLOSING AND POSSESSION:**

   **A. INTENDED USE:** Buyer intends to use the Property as indicated in **paragraph 3E(3)**. Intended use may impact available financing.

   **B. CONDITION OF PROPERTY ON CLOSING:** Unless Otherwise Agreed: (i) the Property shall be delivered "As-Is" in its PRESENT physical condition as of the date of Acceptance; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow or at the time possession is delivered to Buyer, if not on the same date. If items are not removed when possession is delivered to Buyer, all items shall be deemed abandoned. Buyer, after first Delivering to Seller written notice to remove the items within **3 Days**, may pay to have such items removed or disposed of and may bring legal action, as per this Agreement, to receive reasonable costs from Seller.

                                          Initial     Initial

VLPA REVISED 7/24 (PAGE 4 OF 17)      Buyer's Initials _AH_ / _TB_    Seller's Initials _GWA_ / _JLA_   

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 4 OF 17)**

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA 94568*                                              Date: *December 4, 2024*

C. Buyer is strongly advised to conduct investigations of the entire Property in order to determine its present condition. Seller and Agents may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property improvements may not be built according to code, in compliance with current Law, or have had all required permits issued and/or finalized.

D. Seller shall, on Close Of Escrow unless Otherwise Agreed and even if Seller remains in possession, provide keys, passwords, codes and/or means to operate all locks, mailboxes, and all items included in either **paragraph 3P** or **paragraph 9**. If the Property is a condominium or located in a common interest development, Seller shall be responsible for securing or providing any such items for Association amenities, facilities, and access. Buyer may be required to pay a deposit to the Owners' Association ("HOA") to obtain keys to accessible HOA facilities.

8. **CONTINGENCIES AND REMOVAL OF CONTINGENCIES:**

A. **LOAN(S):**
(1) This Agreement is, **unless otherwise specified in paragraph 3L(1) or an attached CR form**, contingent upon Buyer obtaining the loan(s) specified. If contingent, Buyer shall act diligently and in good faith to obtain the designated loan(s). **If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan and Buyer is able to satisfy lender's non-appraisal conditions for closing the loan.**
(2) Buyer is advised to investigate the insurability of the Property as early as possible, as this may be a requirement for lending. Buyer's' ability to obtain insurance for the Property, including fire insurance, is part of Buyer's Insurance contingency. Failure of Buyer to obtain insurance may justify cancellation based on the Insurance contingency but not the loan contingency.
(3) Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement, unless Otherwise Agreed.
(4) If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.
(5) **NO LOAN CONTINGENCY:** If "No loan contingency" is checked in **paragraph 3L(1)**, obtaining any loan specified is NOT a contingency of this Agreement. If Buyer does not obtain the loan specified, and as a result is unable to purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

B. **APPRAISAL:**
(1) This Agreement is, **unless otherwise specified in paragraph 3L(2) or an attached CR form**, contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the amount specified in **paragraph 3L(2)**, without requiring repairs or improvements to the Property. Appraisals are often a reliable source to verify square footage of the subject Property. However, the ability to cancel based on the measurements provided in an appraisal falls within the Investigation of Property contingency. The appraisal contingency is solely limited to the value determined by the appraisal. For any cancellation based upon this appraisal contingency, Buyer shall Deliver a Copy of the written appraisal to Seller, upon request by Seller.
(2) **NO APPRAISAL CONTINGENCY:** If "No appraisal contingency" is checked in **paragraph 3L(2)**, then Buyer may not use the loan contingency specified in **paragraph 3L(1)** to cancel this Agreement if the sole reason for not obtaining the loan is that the appraisal relied upon by Buyer's lender values the property at an amount less than that specified in **paragraph 3L(2)**. If Buyer is unable to obtain the loan specified solely for this reason, Seller may be entitled to Buyer's deposit or other legal remedies.
(3) **Fair Appraisal Act:** See **paragraph 33** for additional information.

C. **MANUFACTURED HOME PURCHASE:** If checked in **paragraph 3L(3)**, this Agreement is contingent upon Buyer acquiring a personal property manufactured home to be placed on the Property after Close Of Escrow.

D. **CONSTRUCTION LOAN FINANCING:** If checked in **paragraph 3L(4)**, this Agreement is contingent upon Buyer obtaining a construction loan.

E. **INVESTIGATION OF PROPERTY:** This Agreement is, as specified in **paragraph 3L(5)**, contingent upon Buyer's acceptance of the condition of, and any other matter affecting, the Property.

F. **INSURANCE:** This Agreement is, as specified in **paragraph 3L(6)**, contingent upon Buyer's assessment of the availability and approval of the cost for any insurance policy desired under this Agreement.

G. **REVIEW OF SELLER DOCUMENTS:** This Agreement is, as specified in **paragraph 3L(7)**, contingent upon Buyer's review and approval of Seller's documents required in **paragraph 17A**.

H. **TITLE:**
(1) This Agreement is, as specified in **paragraph 3L(8)**, contingent upon Buyer's ability to obtain the title policy provided for in **paragraph 16G** and on Buyer's review of a current Preliminary Report and items that are disclosed or observable even if not on record or not specified in the Preliminary Report, and satisfying Buyer regarding the current status of title. Buyer is advised to review all underlying documents and other matters affecting title, including, but not limited to, any documents or deeds referenced in the Preliminary Report and any plotted easements.
(2) Buyer has **5 Days** after receipt to review a revised Preliminary Report, if any, furnished by the Title Company and cancel the transaction if the revised Preliminary Report reveals material or substantial deviations from a previously provided Preliminary Report.

I. **CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES (IF APPLICABLE):** This Agreement is, as specified in **paragraph 3L(9)**, contingent upon Buyer's review and approval of Common Interest Disclosures required by Civil Code § 4525 and under **paragraph 11E** ("CI Disclosures").

J. **BUYER REVIEW OF LEASED OR LIENED ITEMS CONTINGENCY:** Buyer's review of and ability and willingness to assume any lease, maintenance agreement or other ongoing financial obligation, or to accept the Property subject to any lien, disclosed pursuant to **paragraph 9B(2)**, is, as specified in **paragraph 3L(10)**, a contingency of this Agreement. Any assumption of the lease shall not require any financial obligation or contribution by Seller. Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement if Buyer, by the time specified in **paragraph 3L(10)**, refuses to enter into any necessary written agreements to accept responsibility for all obligations of Seller-disclosed leased or liened items.

K. **REMOVAL OR WAIVER OF CONTINGENCIES WITH OFFER: Buyer shall have no obligation to remove a contractual contingency unless Seller has provided all required documents, reports, disclosures, and information pertaining to that contingency.** If Buyer does remove a contingency without first receiving all required information from Seller, Buyer is relinquishing any contractual rights that apply to that contingency. **If Buyer removes or waives any contingencies without an adequate understanding of the Property's condition or Buyer's ability to purchase, Buyer is acting against the advice of Agent.**

VLPA REVISED 7/24 (PAGE 5 OF 17)          Buyer's Initials  *AH* / *TB*   Seller's Initials Initial *GWa* / Initial *JAa*

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 5 OF 17)**

AI Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA  94568*                                                Date: *December 4, 2024*

**L. REMOVAL OF CONTINGENCY OR CANCELLATION:**
   (1) **For any contingency specified in paragraph 3L, 8, or elsewhere Buyer shall, within the applicable period specified, remove the contingency or cancel this Agreement.**
   (2) For the contingencies for review of Seller Documents, Preliminary Report, and Condominium/Planned Development Disclosures, Buyer shall, within the time specified in **paragraph 3L** or **5 Days** after Delivery of the applicable Seller Documents, Preliminary Report, or CI Disclosures, whichever occurs later, remove the applicable contingency in writing or cancel this Agreement.
   (3) If Buyer does not remove a contingency within the time specified, Seller, after first giving Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), shall have the right to cancel this Agreement.

**M. SALE OF BUYER'S PROPERTY:** This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer unless the Sale of Buyer's Property (C.A.R. Form COP) is checked as a contingency of this Agreement in **paragraph 3L(11)**.

**9. ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**
  **A. NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the Multiple Listing Service (MLS), flyers, marketing materials, or disclosures are NOT included in the purchase price or excluded from the sale unless specified in this paragraph or **paragraph 3P** or as Otherwise Agreed. Any items included herein are components of the Property and are not intended to affect the price. All items are transferred without Seller warranty.
  **B. ITEMS INCLUDED IN SALE:**
   (1) All EXISTING fixtures and fittings that are attached to the Property;
   (2) **LEASED OR LIENED ITEMS AND SYSTEMS:** Seller, within the time specified in **paragraph 3N(1)**, shall **(i)** disclose to Buyer if any item or system specified in **paragraph 3P** or **9B** or otherwise included in the sale is leased, or not owned by Seller, or is subject to any maintenance or other ongoing financial obligation, or specifically subject to a lien or other encumbrance or loan, and **(ii)** Deliver to Buyer all written materials (such as lease, warranty, financing, etc.) concerning any such item.
   (3) Seller represents that all items included in the purchase price, unless Otherwise Agreed, **(i)** are owned by Seller and shall be transferred free and clear of liens and encumbrances, except the items and systems identified pursuant to **paragraph 9B(2)**, and **(ii)** are transferred without Seller warranty regardless of value. Seller shall cooperate with the identification of any software or applications and Buyer's efforts to transfer any services needed to operate any Smart Home Features or other items included in this Agreement, including, but not limited to, utilities or security systems.
   (4) A complete inventory of all personal property of Seller currently used in the operation of the Property and included in the purchase price shall be delivered to Buyer within the time specified in **paragraph 3N(1)**.
   (5) Seller shall deliver title to the personal property by Bill of Sale, free of all liens and encumbrances, and without warranty of condition.
   (6) As additional security for any note in favor of Seller for any part of the purchase price, Buyer shall execute a UCC-1 Financing Statement to be filed with the Secretary of State, covering the personal property included in the purchase, replacement thereof, and insurance proceeds.
  **C. ITEMS EXCLUDED FROM SALE:** Unless Otherwise Agreed, all items specified in **paragraph 3P(2)** are excluded from the sale.

**10. ALLOCATION OF COSTS**
  **A. INSPECTIONS, REPORTS, TESTS, AND CERTIFICATES:** Paragraphs **3Q(1), (2), (3)**, and **(13)** only determines who is to pay for the inspection, report, test, certificate or service mentioned; **it does not determine who is to pay for any work recommended or identified in any such document. Agreements for payment of required work should be specified elsewhere in paragraph 3Q, or 3S, or in a separate agreement (such as C.A.R. Forms RR, RRRR, ADM or AEA).** Any reports in these paragraphs shall be Delivered in the time specified in **Paragraph 3N(1)**.
  **B. GOVERNMENT POINT OF SALE REQUIREMENTS:** Point of sale inspections and reports refer to any such actions required to be completed before or after Close Of Escrow that are required in order to close under any Law. If any point of sale requirement requires repairs, retrofits or additional costs beyond an inspection or report, further written agreement regarding costs is required. If an agreement is reached, and unless Parties Otherwise Agree to another time period, any such repair, retrofit, or work shall be completed prior to final verification of Property. If Buyer agrees to pay for any portion of such repair, Buyer, shall **(i)** directly pay to the vendor completing the repair or **(ii)** provide an invoice to Escrow Holder, deposit funds into escrow sufficient to pay for Buyer's portion of such repair and request Escrow Holder pay the vendor completing the repair. If agreement is not reached within the time for removing the Buyer Investigation contingency, then either party may cancel the Agreement.

**11. SELLER DISCLOSURES:**
  **A. WITHHOLDING TAXES:** Buyer and Seller hereby instruct Escrow Holder to withhold the applicable required amounts to comply with federal and California withholding Laws and forward such amounts to the Internal Revenue Service and Franchise Tax Board, respectively. However, no federal withholding is required if, prior to Close Of Escrow, Seller Delivers **(i)** to Buyer and Escrow Holder a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law (FIRPTA); **OR (ii)** to a qualified substitute (usually a title company or an independent escrow company) a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law AND the qualified substitute Delivers to Buyer and Escrow Holder an affidavit signed under penalty of perjury (C.A.R. Form QS) that the qualified substitute has received the fully completed Seller's affidavit and the Seller states that no federal withholding is required; **OR (iii)** to Buyer other documentation satisfying the requirements under Internal Revenue Code § 1445 (FIRPTA). No withholding is required under California Law if, prior to Close Of Escrow, Escrow Holder has received sufficient documentation from Seller that no withholding is required, and Buyer has been informed by Escrow Holder.
  **B. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to § 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at **www.meganslaw.ca.gov**. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

VLPA REVISED 7/24 (PAGE 6 OF 17)          Buyer's Initials  / Seller's Initials

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 6 OF 17)**

At Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: _US Highway 50, Dublin, CA  94568_ _____ Date: _**December 4, 2024**_

**C. NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet Web site maintained by the United States Department of Transportation at **http://www.npms.phmsa.dot.gov/.** To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet Website. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

**D. NATURAL AND ENVIRONMENTAL HAZARDS:** Seller shall, within the time specified in **paragraph 3N(1)**, if required by Law: **(i)** Deliver to Buyer the earthquake guide and environmental hazards booklet, and for all residential property with 1-4 units and any manufactured or mobile home built before January 1, 1960, fully complete and Deliver the Residential Earthquake Risk Disclosure Statement; and **(ii)** even if exempt from the obligation to provide a NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and **(iii)** disclose any other zone as required by Law and provide any other information required for those zones.

**E. CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES:**
   **(1)** Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer whether the Property is a condominium or is located in a planned development, other common interest development, or otherwise subject to covenants, conditions, and restrictions (C.A.R. Form SPQ or ESD).
   **(2)** If the Property is a condominium or is located in a planned development or other common interest development with a HOA, Seller shall, within the time specified in **paragraph 3N(3)**, order from, and pay any required fee as specified in **paragraph 3Q(9)** for the following items to the HOA (C.A.R. Form HOA-IR): **(i)** Copies of any documents required by Law (C.A.R. Form HOA-RS); **(ii)** disclosure of any pending or anticipated claim or litigation by or against the HOA; **(iii)** a statement containing the location and number of designated parking and storage spaces; **(iv)** Copies of the most recent 12 months of HOA minutes for regular and special meetings; **(v)** the names and contact information of all HOAs governing the Property; **(vi)** pet restrictions; and **(vii)** smoking restrictions ("CI Disclosures"). Seller shall itemize and Deliver to Buyer all CI Disclosures received from the HOA and any CI Disclosures in Seller's possession. Seller shall, as directed by Escrow Holder, deposit funds into escrow or direct to HOA or management company to pay for any of the above.

**F. SOLAR POWER SYSTEMS:** For properties with any solar panels or solar power systems, Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer all known information about the solar panels or solar power system. Seller shall use the Solar Advisory and Questionnaire (C.A.R. Form SOLAR).

**G. ADDITIONAL DISCLOSURES:** Within the time specified in **paragraph 3N(1)**, if Seller has actual knowledge, Seller shall provide to Buyer, in writing, the following information:
   **(1) LEGAL PROCEEDINGS:** Any lawsuits by or against Seller, threatening or affecting the Property, including any lawsuits alleging a defect or deficiency in the Property or common areas, or any known notices of abatement or citations filed or issued against the Property.
   **(2) AGRICULTURAL USE:** Whether the Property is subject to restrictions for agricultural use pursuant to the Williamson Act (Government Code §§ 51200-51295).
   **(3) DEED RESTRICTIONS:** Any deed restrictions or obligations.
   **(4) FARM USE:** Whether the Property is in, or adjacent to, an area with Right to Farm rights (Civil Code § 3482.5 and § 3482.6).
   **(5) ENDANGERED SPECIES:** Presence of endangered, threatened, "candidate" species, or wetlands on the Property.
   **(6) ENVIRONMENTAL HAZARDS:** Any substances, materials, or products that may be an environmental hazard including, but not limited to, asbestos, formaldehyde, radon gas, lead-based paint, fuel or chemical storage tanks, and contaminated soil or water on the Property.
   **(7) COMMON WALLS:** Any features of the Property shared in common with adjoining landowners, such as walls, fences, roads, and driveways, and agriculture and domestic wells whose use or responsibility for maintenance may have an effect on the Property.
   **(8) LANDLOCKED:** The absence of legal or physical access to the Property.
   **(9) EASEMENTS/ENCROACHMENTS:** Any encroachments, easements, or similar matters that may affect the Property.
   **(10) SOIL FILL:** Any fill (compacted or otherwise), or abandoned mining operations on the Property.
   **(11) SOIL PROBLEMS:** Any slippage, sliding, flooding, drainage, grading, or other soil problems.
   **(12) EARTHQUAKE DAMAGE:** Major damage to the Property of any of the structures from fire, earthquake, floods, or landslides.
   **(13) ZONING ISSUES:** Any zoning violations, non-conforming uses, or violations of "setback" requirements.
   **(14) NEIGHBORHOOD PROBLEMS:** Any neighborhood noise problems, or other nuisances.
   **(15) SURVEY, PLANS, PERMITS AND ENGINEERING DOCUMENTS:** If in Seller's possession, Copies of surveys, plans, specifications, permits and approvals, development plans, licenses, and engineering documents, if any, prepared on Seller's behalf on in Seller's possession.
   **(16) VIOLATION NOTICES: Seller shall disclose any notice of violations of any Law filed or issued against the Property.**

**H. MELLO-ROOS TAX; 1915 BOND ACT:** Within the time specified in **paragraph 3N(1)**, Seller shall: **(i)** make a good faith effort to obtain a notice from any local agencies that levy a special tax or assessment on the Property (or, if allowed, substantially equivalent notice), pursuant to the Mello-Roos Community Facilities Act, and Improvement Bond Act of 1915, and **(ii)** promptly Deliver to Buyer any such notice obtained.

**I. KNOWN MATERIAL FACTS:** Seller shall, within the time specified in **paragraph 3N(1)**, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including, but not limited to, known insurance claims within the past five years, or provide Buyer with permission to contact insurer to get such information (C.A.R. Form ARC), and make any and all other disclosures required by Law.

**J. SELLER VACANT LAND QUESTIONNAIRE:** Seller shall, within the time specified in **paragraph 3N(1)**, complete and provide Buyer with a Seller Vacant Land Questionnaire (C.A.R. Form VLQ).

**K. SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information, or representations previously provided to Buyer, Seller shall promptly Deliver a subsequent or amended disclosure or notice, in writing, covering those items. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies of which Buyer is otherwise aware or which are disclosed in reports provided to or obtained by Buyer or ordered and paid for by Buyer.**

VLPA REVISED 7/24 (PAGE 7 OF 17)    Buyer's Initials  /     Seller's Initials  / _____

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 7 OF 17)**

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA  94568* _____ Date: *December 4, 2024*

12. **TENANCY RELATED DISCLOSURES:** Within the time specified in **paragraph 3N(1)**, and subject to Buyer's right of review, Seller shall disclose, make available or Deliver, as applicable, to Buyer, the following information:

   **A. RENTAL/SERVICE AGREEMENTS: (i)** All current leases, rental agreements, service contracts, and other agreements pertaining to the operation of the Property; **(ii)** A rental statement including names of tenants, rental rates, period or rental, date of last rent increase, security deposits, rental concessions, rebates or other benefits, if any, and a list of delinquent rents and their duration. Seller represents that no tenant is entitled to any rebate, concession, or other benefit, except as set forth in these documents. Seller represents that the documents to be furnished are those maintained in the ordinary and normal course of business.

   **B. INCOME AND EXPENSE STATEMENTS:** If checked in **paragraph 3R**, the books and records for the Property, if any, including a statement of income and expense for the 12 months preceding Acceptance. Seller represents that the books and records are those maintained in the ordinary and normal course of business and used by Seller in the computation of federal and state income tax returns.

   **C. TENANT ESTOPPEL CERTIFICATES:** If checked in **paragraph 3R**, Tenant Estoppel Certificates (C.A.R. Form TEC). Tenant Estoppel Certificates shall be completed by Seller or Seller's agent and delivered to tenant(s) for tenant(s) to sign and acknowledge: **(i)** that tenant(s)' rental or lease agreements are unmodified and in full force and effect, (or if modified, stating all such modifications); **(ii)** that no lessor defaults exist; and **(iii)** stating the amount of any prepaid rent or security deposit. Seller shall exercise good faith to obtain tenant(s)' signature(s), but Seller cannot guarantee tenant(s)' cooperation. In the event Seller cannot obtain signed Tenant Estoppel Certificates within the time specified above, Seller shall notify Buyer and provide the unsigned one that was provided to tenant(s). If, after the time specified for Seller to Deliver the TEC to Buyer, any tenant(s) sign and return a TEC to Seller, Seller shall Deliver that TEC to Buyer.

   **D. SELLER REPRESENTATIONS:** Unless otherwise disclosed under **paragraph 11**, **paragraph 12**, or under any disclosure Delivered to Buyer:

     (1) Seller represents that Seller has no actual knowledge that any tenant(s): **(i)** has any current pending lawsuit(s), investigation(s), Inquiry(ies), action(s), or other proceeding(s) affecting the Property of the right to use and occupy it; **(ii)** has any unsatisfied mechanics or materialman lien(s) affecting the Property; and **(iii)** is the subject of a bankruptcy. If Seller receives any such notice, prior to Close Of Escrow, Seller shall immediately notify Buyer.

     (2) Seller represents that no tenant is entitled to any rebate, concessions, or other benefit, except as set forth in the rental service agreements.

     (3) Seller represents that the documents to be furnished are those maintained in the ordinary and normal course of business and the income and expense statements are and used by Seller in the computation of federal and state income tax returns.

13. **CHANGES DURING ESCROW:**

   **A.** Prior to Close Of Escrow, Seller may engage in the following acts ("Proposed Changes"), subject to Buyer's rights in **paragraph 13B: (i)** rent or lease any vacant unit or other part of the premises; **(ii)** alter, modify, or extend any existing rental or lease agreement; **(iii)** enter into, alter, modify, or extend any service contract(s); or **(iv)** change the status of the condition of the Property.

   **B.** (1) At least **7 Days** prior to any Proposed Changes, Seller shall Deliver written notice to Buyer of such Proposed Change

     (2) Within **5 Days** after receipt of such notice, Buyer, in writing, may give Seller notice of Buyer's objection to the Proposed Changes in which case Seller shall not make the Proposed Changes.

14. **SECURITY DEPOSITS:** Security deposits, if any, to the extent they have not been applied by Seller in accordance with any rental agreement and current Law, shall be transferred to Buyer on Close Of Escrow. Seller shall notify each tenant, in compliance with the California Civil Code.

15. **BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

   **A.** Buyer shall, within the time specified in **paragraph 3L(5)**, have the right, at Buyer's expense unless Otherwise Agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations").

   **B.** Buyer Investigations include, but are not limited to:

     (1) Inspections regarding any physical attributes of the Property or items connected to the Property, such as:

       (A) A general inspection.

       (B) An inspection for lead-based paint and other lead-based paint hazards.

       (C) An inspection specifically for wood destroying pests and organisms. Any inspection for wood destroying pests and organisms shall be prepared by a registered Structural Pest Control company; shall cover the main building and attached structures; may cover detached structures; shall NOT include water tests of shower pans on upper level units unless the owners of property below the shower consent; shall NOT include roof coverings; and, if the Property is a unit in a condominium or other common interest subdivision, the inspection shall include only the separate interest and any exclusive-use areas being transferred, and shall NOT include common areas; and shall include a report ("Pest Control Report") showing the findings of the company which shall be separated into sections for evident infestation or infections (Section 1) and for conditions likely to lead to infestation or infection (Section 2).

       (D) A phase one environmental survey, paid for and obtained by the party indicated in **paragraph 3Q(2)**. If Buyer is responsible for obtaining and paying for the survey, Buyer shall act diligently and in good faith to obtain such survey within the time specified in **paragraph 3L(5)**. Buyer has **5 Days** after receiving the survey to remove this portion of the Buyer's Investigation contingency.

       (E) Any other specific inspections of the physical condition of the land and improvements.

     (2) Buyer Investigations of any other matter affecting the Property, other than those that are specified as separate contingencies. Buyer Investigations do not include, among other things, an assessment of the availability and cost of general homeowner's insurance, flood insurance, and fire insurance. See, Buyer's Vacant Land Additional Inspection Advisory (C.A.R. Form BVLIA) for more.

   **C.** Without Seller's prior written consent, Buyer shall neither make nor cause to be made: **(i)** invasive or destructive Buyer Investigations, except for minimally invasive testing required to prepare a Pest Control Report, which shall not include any holes or drilling through stucco or similar material; or **(ii)** inspections by any governmental building or zoning inspector or government employee, unless required by Law.

   **D.** Seller shall make the Property available for all Buyer Investigations. Seller is not obligated to move any existing personal property. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is delivered to Buyer. Buyer shall, **(i)** by the time specified in **paragraph 3L(5)**, complete Buyer Investigations and satisfy themselves as to the condition of the Property, and either remove the contingency or cancel this Agreement, and **(ii)** by the time specified in **paragraph 3L(5)** or **3 Days** after receipt of any Investigation report, whichever is later, give Seller at no cost, complete Copies of all such reports obtained by Buyer, which obligation shall survive the termination of this Agreement. This Delivery of Investigation reports shall not include any appraisal.

VLPA REVISED 7/24 (PAGE 8 OF 17)

Buyer's Initials  /   Seller's Initials  /

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 8 OF 17)**

At Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA 94568* _____ Date: *December 4, 2024*

E. **Buyer indemnity and Seller protection for entry upon the Property:** Buyer shall: **(i)** keep the Property free and clear of liens; **(ii)** repair all damage arising from Buyer Investigations; and **(iii)** indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

F. **BUYER IS STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY AND ALL MATTERS AFFECTING THE VALUE OR DESIRABILITY OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE ITEMS SPECIFIED BELOW. IF BUYER DOES NOT EXERCISE THESE RIGHTS, BUYER IS ACTING AGAINST THE ADVICE OF BROKERS. BUYER UNDERSTANDS THAT ALTHOUGH CONDITIONS ARE OFTEN DIFFICULT TO LOCATE AND DISCOVER, ALL REAL PROPERTY CONTAINS CONDITIONS THAT ARE NOT READILY APPARENT AND THAT MAY AFFECT THE VALUE OR DESIRABILITY OF THE PROPERTY. BUYER AND SELLER ARE AWARE THAT BROKREES DO NOT GUARANTEE, AND IN NO WAY ASSUME RESPONSIBILITY FOR, THE CONDITION OF THE PROPERTY. BROKERS HAVE NOT AND WILL NOT VERIFY ANY OF THE ITEMS IN PARAGRAPH 15, UNLESS OTHERWISE AGREED IN WRITING.**

G. **SIZE, LINES, ACCESS, AND BOUNDARIES:** Lot size, property lines, legal or physical access, and boundaries including features of the Property shared in common with adjoining landowners, such as walls, fences, roads, and driveways, whose use or responsibility for maintenance may have an effect on the Property and any encroachments, easements, or similar matters that may affect the Property. (Fences, hedges, walls, and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. Property lines may be verified by survey.) (Unless otherwise specified in writing, any numerical statements by Brokers regarding lot size are APPROXIMATIONS ONLY, which have not been and will not be verified, and should not be relied upon by Buyer.)

H. **ZONING AND LAND USE:** Past, present, or proposed laws, ordinances, referendums, initiatives, votes, applications, and permits affecting the current use of the Property, future development, zoning, building, size, governmental permits and inspections. Any zoning violations, non-conforming uses, or violations of "setback' requirements. (Buyer should also investigate whether these matters affect Buyer's intended use of the Property.

I. **UTILITIES AND SERVICES:** Availability, costs, restrictions, and location of utilities and services, including but not limited to, sewerage, sanitation, septic and leach lines, water, electricity, gas, telephone, cable TV, and drainage.

J. **ENVIRONMENTAL HAZARDS:** Potential environmental hazards, including but not limited to, asbestos, lead-based paint and other lead contamination, radon, methane, other gases, fuel, oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, including mold (airborne, toxic, or otherwise), fungus or similar contaminant, materials, products, or conditions.

K. **GEOLOGIC CONDITIONS:** Geologic/seismic conditions, soil and terrain stability, suitability and drainage including slippage, sliding, flooding, drainage, grading, fill (compacted or otherwise), or other soil problems.

L. **NATURAL HAZARD ZONE:** Special Flood Hazard Areas, Potential Flooding (Inundation) Areas, Very High Hazard Zones, State Fire Responsibility Areas, Earthquake Fault Zones, Seismic Hazard Zones, or any other zone for which disclosure is required by Law.

M. **PROPERTY DAMAGE:** Major damage to the Property of any of the structures or non-structural systems and components and any personal property included in the sale from fire, earthquake, floods, landslides, or other causes.

N. **NEIGHBORHOOD, AREA, AND PROPERTY CONDITIONS:** Neighborhood or are conditions, including Agricultural Use Restrictions pursuant to the Williamson Act (Government Code §§ 51200-51295), Right to Farm Laws (Civil Code § 3482.5 and § 3482.6), schools, proximity and adequacy of law enforcement, crime statistics, the proximity of registered felons or offenders, fire protection, other government services, availability, adequacy, and cost of any speed-wired, wireless internet connections, or other telecommunications or other technology services and installations, proximity to commercial, industrial, or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, abandoned mining operations on the Property, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally protected sites or improvements, cemeteries, facilities and condition of common areas of common interest subdivisions, and possible lack of compliance with any governing documents or Owners' Association requirements, conditions, and influences of significance to certain cultures and/or religions, and personal needs, requirements, and preferences of Buyer.

O. **COMMON INTEREST SUBDIVISIONS; OWNER ASSOCIATIONS:** Facilities and condition of common areas (facilities such as pools, tennis courts, walkways, or other areas co-owned in undivided interest with others), Owners' Association that has any authority over the subject property, CC&Rs, or other deed restrictions or obligations, and possible lack of compliance with any Owners' Association requirements.

P. **SPECIAL TAX:** Any local agencies that levy a special tax on the Property pursuant to the Mello-Roos Community facilities Act or Improvement Bond Act of 1915.

Q. **RENTAL PROPERTY RESTRICTIONS:** Some cities and counties impose restrictions that limit the amount of rent that can be charged, the maximum number of occupants, and the right of landlord to terminate a tenancy.

R. **MANUFACTURED HOME PLACEMENT:** Conditions that may affect the ability to place and use a manufactured home on the Property.

16. **TITLE AND VESTING:**

A. Buyer shall, within the time specified in **paragraph 3N(1)**, be provided a current Preliminary Report by the person responsible for paying for the title report in **paragraph 3Q(5)**. If Buyer is responsible for paying, Buyer shall act diligently and in good faith to obtain such Preliminary Report within the time specified. The Preliminary Report is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. The company providing the Preliminary Report shall, prior to issuing a Preliminary Report, conduct a search of the General Index for all Sellers except banks or other institutional lenders selling properties they acquired through foreclosure (REOs), corporations, and government entities.

B. Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except for: **(i)** monetary liens of record unless Buyer is assuming those obligations or taking the Property subject to those obligations; and **(ii)** those matters which Seller has agreed to remove in writing. For any lien or matter not being transferred upon sale, Seller will take necessary action to deliver title free and clear of such lien or matter.

C. Seller shall within **7 Days** after request, give Escrow Holder necessary information to clear title. Initial _____ Initial _____

VLPA REVISED 7/24 (PAGE 9 OF 17)      Buyer's Initials  *AH* / *TB*   Seller's Initials *GWa* / *JAa*

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 9 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com      Us Highway 50,

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: <u>US Highway 50, Dublin, CA  94568</u>                                    Date: <u>December 4, 2024</u>

**D.** Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer all matters known to Seller affecting title, whether of record or not.

**E.** If Buyer is a legal entity and the Property purchase price is at least $300,000 and the purchase price is made without a bank loan or similar form of external financing, a Geographic Targeting Order (GTO) issued by the Financial Crimes Enforcement Network, U.S. Department of the Treasury, requires title companies to collect and report certain information about the Buyer, depending on where the Property is located. Buyer agrees to cooperate with the title company's effort to comply with the GTO.

**F.** Buyer shall, after Close Of Escrow, receive a recorded grant deed or any other conveyance document required to convey title (For example, for stock cooperative or tenancy in common, respectively, an assignment of stock certificate or assignment of seller's interest in the real property), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's vesting instructions. The recording document shall contain Buyer's post-closing mailing address to enable Buyer's receipt of the recorded conveyance document from the County Recorder. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

**G.** Buyer shall receive a Standard Coverage Owner's CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and shall pay any increase in cost.

**17. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR-B, CR-S or CC).**

**A. SELLER DELIVERY OF DOCUMENTS:** Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer all reports, disclosures and information ("Reports") for which Seller is responsible as specified in **paragraphs 9B(2), 10, 11A, 11D-J, 12A, 12B, 12C, 16A, 16D, and 36.**

**B. BUYER REVIEW OF DOCUMENTS; REPAIR REQUEST; CONTINGENCY REMOVAL OR CANCELLATION**

    (1) Buyer has the time specified in **paragraph 3** to: (i) perform Buyer Investigations; review all disclosures, Reports, lease documents to be assumed by Buyer pursuant to **paragraph 9B(2)**, and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property.

    (2) Buyer may, within the time specified in **paragraph 3L(5)**, request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests (C.A.R. Form RR or RRRR). If Seller does not agree or does not respond, Buyer is not contractually entitled to have the repairs or other requests made and may only cancel based on contingencies in this Agreement.

    (3) Buyer shall, by the end of the times specified in **paragraph 3L** (or as Otherwise Agreed), Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement (C.A.R. Form CR-B or CC). Buyer is advised not to remove contingencies related to review of documents until after the documents have been Delivered. If Delivery of any Report occurs after a contractual contingency pertaining to that Report has already been waived or removed, the Delivery of the Report does not revive the contingency.

    (4) **Continuation of Contingency:** Even after the end of the time specified in **paragraph 3L** and before Seller cancels, if at all, pursuant to **paragraph 17C**, Buyer retains the right, in writing, to either **(i)** remove remaining contingencies, or **(ii)** cancel this Agreement based on a remaining contingency. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to **paragraph 17C(1)**.

**C. SELLER RIGHT TO CANCEL:**

    (1) **SELLER RIGHT TO CANCEL; BUYER CONTINGENCIES:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement, then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.

    (2) **SELLER RIGHT TO CANCEL; BUYER CONTRACT OBLIGATIONS:** Seller, after first Delivering to Buyer a Notice to Buyer to Perform, may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): **(i)** Deposit funds as required by **paragraph 3D(1)** or **3D(2)** or if the funds deposited pursuant to **paragraph 3D(1)** or **3D(2)** are not good when deposited; **(ii)** Deliver updated contact information for Buyer's lender(s) as required by **paragraph 5C(3)**; **(iii)** Deliver verification, or a satisfactory verification if Seller reasonably disapproves of the verification already provided, as required **by paragraph 5B or 6A; (iv)** Deliver a letter as required **by paragraph 6B; (v)** In writing assume or accept leases or liens specified in **paragraph 8J; (vi)** Cooperate with the title company's effort to comply with the GTO as required by **paragraph 16E; (vii)** Sign or initial a separate liquidated damages form for an increased deposit as required by **paragraph 5A(2) and 37; (viii)** Provide evidence of authority to Sign in a representative capacity as specified in **paragraph 36; or (ix)** Perform any additional Buyer contractual obligation(s) included in this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees allocated to Seller in this Agreement and already paid by Escrow prior to cancellation of this Agreement and notification to Escrow.

    (3) **SELLER RIGHT TO CANCEL; SELLER CONTINGENCIES:** Seller may cancel this Agreement by good faith exercise of any Seller contingency included in this Agreement, or Otherwise Agreed, so long as that contingency has not already been removed or waived in writing.

**D. BUYER RIGHT TO CANCEL:**

    (1) **BUYER RIGHT TO CANCEL; SELLER CONTINGENCIES:** If, by the time specified in this Agreement, Seller does not Deliver to Buyer a removal of the applicable contingency or cancellation of this Agreement, then Buyer, after first Delivering to Seller a Notice to Seller to Perform (C.A.R. Form NSP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees allocated to Seller in the Agreement and already paid by Escrow prior to cancellation of this Agreement and notification to Escrow.

    (2) **BUYER RIGHT TO CANCEL; SELLER CONTRACT OBLIGATIONS:** If, by the time specified, Seller has not Delivered any item specified in **paragraph 3N(1)** or Seller has not performed any Seller contractual obligation included in this Agreement by the time specified, Buyer, after first Delivering to Seller a Notice to Seller to Perform, may cancel this Agreement.

    (3) **BUYER RIGHT TO CANCEL; BUYER CONTINGENCIES:** Buyer may cancel this Agreement by good faith exercise of any Buyer contingency included in **paragraph 8**, or Otherwise Agreed, so long as that contingency has not already been removed in writing.

---

VLPA REVISED 7/24 (PAGE 10 OF 17)        Buyer's Initials <u>AH</u> , <u>TB</u>    Seller's Initials <u>GWA</u> , <u>JAA</u>



**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 10 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com        Us Highway 50,

At Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: US Highway 50, Dublin, CA 94568 _____ Date: **December 4, 2024**

**E. NOTICE TO BUYER OR SELLER TO PERFORM:** The Notice to Buyer to Perform or Notice to Seller to Perform shall: **(i)** be in writing; **(ii)** be Signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 Days** after Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform or Notice to Seller to Perform may not be Delivered any earlier than **2 Days** prior to the Scheduled Performance Day to remove a contingency or cancel this Agreement or meet an obligation specified in **paragraph 17**, except for Close of Escrow which shall be Delivered under the terms of **paragraph 17G**, whether or not the Scheduled Performance Day falls on a Saturday, or Sunday or legal holiday. If a Notice to Buyer to Perform or Notice to Seller to Perform is incorrectly Delivered or specifies a time less than the agreed time, the notice shall be deemed invalid and void. However, if the notice is for multiple items, the notice shall be valid for all contingencies and contractual actions for which the Delivery of the notice is within the time permitted in the Agreement and void as to the others. Seller or Buyer shall be required to Deliver a new Notice to Buyer to Perform or Notice to Seller to Perform with the specified timeframe.

**F. EFFECT OF REMOVAL OF CONTINGENCIES:**

**(1) REMOVAL OF BUYER CONTINGENCIES:** If Buyer removes any contingency or cancellation rights, unless Otherwise Agreed, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of Reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for the non-delivery of any Reports, disclosures or information outside of Seller's control and for any Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.

**(2) REMOVAL OF SELLER CONTINGENCIES:** If Seller removes any contingency or cancellation rights, unless Otherwise Agreed, Seller shall conclusively be deemed to have: **(i)** satisfied themselves regarding such contingency, **(ii)** elected to proceed with the transaction; and **(iii)** given up any right to cancel this Agreement based on such contingency.

**G. DEMAND TO CLOSE ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a Demand to Close Escrow (C.A.R. Form DCE). The DCE shall: **(i)** be Signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 Days** after Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** prior to the Scheduled Performance Day for the Close Of Escrow. If a DCE is incorrectly Delivered or specifies a time less than the agreed time, the DCE shall be deemed invalid and void and Seller or Buyer shall be required to Deliver a new DCE.

**H. EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign and Deliver mutual instructions to cancel the sale and escrow and release deposits, if any, to the Party entitled to the funds, less **(i)** fees and costs paid by Escrow Holder on behalf of that Party, if required by this Agreement; and **(ii)** any escrow fee charged to that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. **A release of funds will require mutual Signed release instructions from the Parties, judicial decision or arbitration award. A Party may be subject to a civil penalty of up to $1,000 for refusal to Sign cancellation instructions if no good faith dispute exists as to which Party is entitled to the deposited funds (Civil Code § 1057.3). Note: Neither Agents nor Escrow Holder are qualified to provide any opinion on whether either Party has acted in good faith or which Party is entitled to the deposited funds. Buyer and Seller are advised to seek the advice of a qualified California real estate attorney regarding this matter.**

**18. REPAIRS:** Repairs shall be completed prior to final verification of condition unless Otherwise Agreed. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. Buyer acknowledges that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: **(i)** obtain invoices and paid receipts for Repairs performed by others; **(ii)** prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and **(iii)** provide Copies of invoices and paid receipts and statements to Buyer prior to final verification of condition.

**19. FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final verification of the Property condition within the time specified in **paragraph 3J**, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: **(i)** the Property is maintained pursuant to **paragraph 7B**; **(ii)** Repairs have been completed as agreed; and **(iii)** Seller has complied with Seller's other obligations under this Agreement (C.A.R. Form VP).

**20. PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless Otherwise Agreed, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, Seller rental payments, HOA regular assessments due prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. Seller shall pay any HOA special or emergency assessments due prior to Close Of Escrow. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special or emergency assessments that are due after Close Of Escrow. Property will be reassessed upon change of ownership. Any supplemental tax bills delivered to Escrow Holder prior to closing shall be prorated and paid as follows: **(i)** for periods after Close Of Escrow, by Buyer; and **(ii)** for periods prior to Close Of Escrow, by Seller (see C.A.R. Form SPT or SBSA for further information). Seller agrees all service fees, maintenance costs and utility bills will be paid current up and through the date of Close Of Escrow. TAX BILLS AND UTILITY BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

**21. BROKERS AND AGENTS:**

**A. COMPENSATION:** Seller or Buyer, or both, as applicable, agree to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer. Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer. If Seller agrees to pay the obligation of Buyer to compensate Buyer's Broker (see **paragraph 3G(3)**), Seller shall be entitled to a copy of the portion of the written compensation agreement between Buyer and Buyer's Broker identifying the compensation to be paid. See C.A.R. Form SPBB for further information.

VLPA REVISED 7/24 (PAGE 11 OF 17)    Buyer's Initials  /     Seller's Initials  /

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 11 OF 17)**

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: US Highway 50, Dublin, CA 94568 _____ Date: **December 4, 2024**

**B. SCOPE OF DUTY:** Buyer and Seller acknowledge and agree that Agent: **(i)** Does not decide what price Buyer should pay or Seller should accept; **(ii)** Does not guarantee the condition of the Property; **(iii)** Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; **(iv)** Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; **(v)** Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Agent; **(vi)** Shall not be responsible for inspecting public records or permits concerning the title or use of Property; **(vii)** Shall not be responsible for identifying the location of boundary lines or other items affecting title; **(viii)** Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; **(ix)** Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; **(x)** Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and **(xi)** Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

**C. BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations, and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify and hold the other, the Brokers specified herein and their agents, harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representation in this paragraph.

**22. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**

**A.** **The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: **paragraphs 1, 3A, 3B, 3D-G, 3N(2), 3Q, 3S, 4A, 4B, 5A(1-2), 5D, 5E, 11A, 11E(2), 16 (except 16D), 17H, 20, 21A, 22, 26, 32, 35, 36, 40,** and **41.** If a Copy of the separate compensation agreement(s) provided for in paragraph 21A is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned.

**B.** Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller shall Sign and return Escrow Holder's general provisions or supplemental instructions within the time specified in **paragraph 3N(2).** Buyer and Seller shall execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow and, as directed by Escrow Holder, within **3 Days,** shall pay to Escrow Holder or HOA or HOA management company or others any fee required by **paragraphs 3, 8, 11,** or elsewhere in this Agreement.

**C.** A Copy of this Agreement including any counter offer(s) and addenda shall be delivered to Escrow Holder within **3 Days** after **Acceptance.** Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title Company when received from Seller, if a separate company is providing title insurance. If Seller delivers an affidavit to Escrow Holder to satisfy Seller's FIRPTA obligation under **paragraph 11A,** Escrow Holder shall deliver to Buyer, Buyer's Agent, and Seller's Agent a Qualified Substitute statement that complies with federal Law. If Escrow Holder's Qualified Substitute statement does not comply with federal law, the Parties instruct escrow to withhold all applicable required amounts under **paragraph 11A.**

**D.** Agents are not a party to the escrow except for the sole purpose of receiving compensation pursuant to **paragraph 21A.** If a Copy of the separate compensation agreement(s) is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). Escrow Holder shall provide to Buyer and Seller, either jointly or separately, a closing statement or other written documentation showing the amount of compensation paid to, respectively, Buyer's Broker and Seller's Broker. Buyer and Seller irrevocably assign to Brokers compensation specified in **paragraph 21A,** and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.

**E.** Buyer and Seller acknowledge that Escrow Holder may require invoices for expenses under this Agreement. Buyer and Seller, upon request by Escrow Holder, within **3 Days** or within a sufficient time to close escrow, whichever is sooner, shall provide any such invoices to Escrow Holder.

**F.** Upon receipt, Escrow Holder shall provide Buyer, Seller, and each Agent verification of Buyer's deposit of funds pursuant to **paragraph 5A(1) and 5A(2).** Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify each Agent: **(i)** if Buyer's initial or any additional deposit or down payment is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller instruct Escrow Holder to cancel escrow.

**G.** A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within **3 Days** after mutual execution of the amendment.

**23. SELECTION OF SERVICE PROVIDERS:** Agents do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Agent or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.

**24. MULTIPLE LISTING SERVICE ("MLS"):** Agents are authorized to report to the MLS that an offer has been accepted and, upon Close Of Escrow, the sales price and other terms of this transaction shall be provided to the MLS to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS. Buyer acknowledges that: **(i)** any pictures, videos, floor plans (collectively, "Images") or other information about the Property that has been or will be inputted into the MLS or internet portals, or both, at the instruction of Seller or in compliance with MLS rules, will not be removed after Close Of Escrow; **(ii)** California Civil Code § 1088(c) requires the MLS to maintain such Images and information for at least three years and as a result they may be displayed or circulated on the Internet, which cannot be controlled or removed by Seller or Agents; and **(iii)** Seller, Seller's Agent, Buyer's Agent, and MLS have no obligation or ability to remove such Images or information from the Internet.

**VLPA REVISED 7/24 (PAGE 12 OF 17)**   Buyer's Initials  **AH** / **TB**   Seller's Initials  *Initial* **GWa** / **JAa**

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 12 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com    Us Highway 50,

AI Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: _US Highway 50, Dublin, CA 94568_ Date: _December 4, 2024_

**25. ATTORNEY FEES AND COSTS:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in **paragraph 38A.**

**26. ASSIGNMENT/NOMINATION:** Buyer shall have the right to assign all of Buyer's interest in this Agreement to Buyer's own trust or to any wholly owned entity of Buyer that is in existence at the time of such assignment. Otherwise, Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the separate written consent of Seller to a specified assignee. Such consent shall not be unreasonably withheld. Prior to any assignment, Buyer shall disclose to Seller the name of the assignee and the amount of any monetary consideration between Buyer and assignee. Buyer shall provide assignee with all documents related to this Agreement including, but not limited to, the Agreement and any disclosures. If assignee is a wholly owned entity or trust of Buyer, that assignee does not need to re-sign or initial all documents provided. Whether or not an assignment requires seller's consent, at the time of assignment, assignee shall deliver a letter from assignee's lender that assignee is prequalified or preapproved as specified in **paragraph 6B.** Should assignee fail to deliver such a letter, Seller, after first giving Assignee an Notice to Buyer to Perform, shall have the right to terminate the assignment. Buyer shall, within the time specified in **paragraph 3K,** Deliver any request to assign this Agreement for Seller's consent. If Buyer fails to provide the required information within this time frame, Seller's withholding of consent shall be deemed reasonable. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless Otherwise Agreed by Seller (C.A.R. Form AOAA). Parties shall provide any assignment agreement to Escrow Holder within **1 Day** after the assignment. Any nomination by Buyer shall be subject to the same procedures, requirements, and terms as an assignment as specified in this paragraph.

**27. SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

**28. ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: **(i)** Federal, state, and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; **(ii)** Agent(s) has/have made no representation concerning the applicability of any such Law to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; **(iii)** Agent(s) has/have made no representation concerning the existence, testing, discovery, location, and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property; and **(iv)** Buyer and Seller are each advised to consult with technical and legal experts concerning the existence, testing, discover, location and evaluation of/for, and risks posed by, environmentally hazardous substances, in any, located on or potentially affecting the Property.

**29. AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. Residential properties are not typically covered by the ADA, but may be governed by its provisions if used for certain purposes. The ADA can require, among other things, that building be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary and injunctive remedies may be incurred if the Property is not in compliance. A real estate broker or agent does not have the technical expertise to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact a qualified California real estate attorney, contractor, architect, engineer, or other qualified professional of Buyer or Seller's own choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

**30. EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.

**31. COPIES:** Seller and buyer each represent that Copies of all reports, certificates, approvals, and other documents that are furnished to the other are true, correct, and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

**32. DEFINITIONS and INSTRUCTIONS:** The following words are defined terms in this Agreement, shall be indicated by initial capital letters throughout this Agreement, and have the following meaning whenever used:

   **A.** **"Acceptance"** means the time the offer or final counter offer is fully executed, in writing, by the recipient Party and is Delivered to the offering Party or that Party's Authorized Agent.

   **B.** **"Agent"** means the Broker, salesperson, broker-associate or any other real estate licensee licensed under the brokerage firm identified in **paragraph 2B.**

   **C.** **"Agreement"** means this document and any counter offers and any incorporated addenda or amendments, collectively forming the binding agreement between the Parties. Addenda and amendments are incorporated only when Signed and Delivered by all Parties.

   **D.** **"As-Is"** condition: Seller shall disclose known material facts and defects as specified in this Agreement. Buyer has the right to inspect the Property and, within the time specified, request that Seller make repairs or take other corrective action, or exercise any contingency cancellation rights in this Agreement. Seller is only required to make repairs specified in this Agreement or as Otherwise Agreed.

   **E.** **"Authorized Agent"** means an individual real estate licensee specified in the Real Estate Broker Section.

   **F.** **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the Parties.

   **G.** **"Close Of Escrow"**, including **"COE"**, means the date the grant deed, or other evidence of transfer of title, is recorded for any real property, or the date of Delivery of a document evidencing the transfer of title for any non-real property transaction.

   **H.** **"Copy"** means copy by any means including photocopy, facsimile and electronic.

   **I.** **Counting Days** is done as follows unless Otherwise Agreed: (1) The first Day after an event is the first full calendar date following the event, and ending at 11:59 pm. For example, if a Notice to Buyer to Perform (C.A.R. form NBP) is Delivered at 3 pm on the 7th calendar day of the month, or Acceptance of a counter offer is personally received at 12 noon on the 7th calendar day of the month, then the 7th is Day "0" for purposes of counting days to respond to the NBP or calculating the Close Of Escrow date or contingency removal dates and the 8th of the month is Day 1 for those same purposes. (2) All calendar days are counted in establishing the first Day after an event. (3) All calendar days are counted in determining the date upon which performance must be completed, ending at 11:59 pm on the last day for performance ("Scheduled Performance Day"). (4) After Acceptance, if the Scheduled Performance Day for any act required by this Agreement, including Close Of Escrow, lands on a Saturday, Sunday, or Legal Holiday, the performing party shall be allowed to perform on the next day that is not a Saturday, Sunday or Legal Holiday ("Allowable Performance Day"), and ending at 11:59 pm. "Legal Holiday" shall mean any holiday or optional bank holiday under Civil Code §§ 7 and 7.1 and any holiday under Government Code § 6700. (5) For the purposes of COE, any day that the Recorder's office in the County where the Property is located is closed or any day that the lender or Escrow Holder under this Agreement is closed, the COE shall occur on the next day the Recorder's office in that County, the lender, and the Escrow Holder are open. (6) COE is considered Day 0 for purposes of counting days Seller is allowed to remain in possession, if permitted by this Agreement.

   **J.** **"Day"** or **"Days"** means calendar day or days. However, delivery of deposit to escrow is based on business days.

VLPA REVISED 7/24 (PAGE 13 OF 17)    Buyer's Initials _AH_ / _TB_    Seller's Initials _GWA_ / _JAA_

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 13 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com    Us Highway 50,

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA 94568*          Date: **December 4, 2024**

**K.** **"Deliver", "Delivered" or "Delivery"** of documents, unless Otherwise Agreed, means and shall be effective upon personal receipt of the document by Buyer or Seller or their Authorized Agent. Personal receipt means **(i)** a Copy of the document, or as applicable, link to the document, is in the possession of the Party or Authorized Agent, regardless of the Delivery method used (i.e. e-mail, text, other). A document, or as applicable link to a document, shall be deemed to be "in possession" if it is located in the inbox for the applicable Party or Authorized Agent; or **(ii)** an electronic Copy of the document, or as applicable, link to the document, has been sent to the designated electronic delivery address specified in the Real Estate Broker Section unless Otherwise Agreed in C.A.R. Form DEDA. After Acceptance, Agent may change the designated electronic delivery address for that Agent by, in writing, Delivering notice of the change in designated electronic delivery address to the other Party (C.A.R. Form DEDA). Links could be, for example, to DropBox or GoogleDrive or other functionally equivalent program. If the recipient of a link is unable or unwilling to open the link or download the documents or otherwise prefers Delivery of the documents directly, Recipient of a link shall notify the sender in writing, within **3 Days** after Delivery of the link (C.A.R. Form RFR). In such case, Delivery shall be effective upon Delivery of the documents and not the link. Failure to notify sender within the time specified above shall be deemed consent to receive, and Buyer opening, the document by link.

**L.** **"Electronic Copy"** or **"Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Unless Otherwise Agreed, Buyer and Seller agree to the use of Electronic Signatures. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.

**M.** **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.

**N.** **"Legally Authorized Signer"** means an individual who has authority to Sign for the principal as specified in **paragraph 40** or **paragraph 41.**

**O.** **"Otherwise Agreed"** means an agreement in writing, signed by both Parties and Delivered to each.

**P.** **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.

**Q.** **"Sign" or "Signed"** means either a handwritten or Electronic Signature on an original document, Copy or any counterpart.

**33. FAIR APPRAISAL ACT NOTICE:**

**A.** Any appraisal of the property is required to be unbiased, objective, and not influenced by improper or illegal considerations, including, but not limited to, any of the following: race, color, religion (including religious dress, grooming practices, or both), gender (including, but not limited to, pregnancy, childbirth, breastfeeding, and related conditions, and gender identity and gender expression), sexual orientation, marital status, medical condition, military or veteran status, national origin (including language use and possession of a driver's license issued to persons unable to provide their presence in the United States is authorized under federal law), source of income, ancestry, disability (mental and physical, including, but not limited to, HIV/AIDS status, cancer diagnosis, and genetic characteristics), genetic information, or age.

**B.** If a buyer or seller believes that the appraisal has been influenced by any of the above factors, the seller or buyer can report this information to the lender or mortgage broker that retained the appraiser and may also file a complaint with the Bureau of Real Estate Appraisers at https://www2.brea.ca.gov/complaint/ or call (916) 552-9000 for further information on how to file a complaint.

**34. TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the terms and conditions herein. The individual Liquidated Damages and Arbitration of Disputes paragraphs are incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a Counter Offer or addendum. **If at least one but not all Parties initial, a Counter Offer is required until agreement is reached.** Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance and to market the Property for backup offers after Acceptance. The Parties have read and acknowledge receipt of a Copy of the offer and agree to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing. By signing this offer or any document in the transaction, the Party Signing the document is deemed to have read the document in its entirety.

**35. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as Otherwise Agreed, this Agreement shall be interpreted, and disputes shall be resolved in accordance with the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

**36. LEGALLY AUTHORIZED SIGNER:** Wherever the signature or initials of the Legally Authorized Signer identified in **paragraph 40** and **41** appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Legally Authorized Signer **(i)** represents that the entity for which that person is acting already exists and is in good standing to do business in California and **(ii)** shall Deliver to the other Party and Escrow Holder, as specified in **paragraph 3N(4)**, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code § 18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

---

**37. LIQUIDATED DAMAGES:**

If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT THE TIME OF ANY INCREASED DEPOSIT BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R. FORM DID).

Buyer's Initials *AH* / *TB*          Seller's Initials [Initial] *GWA* [Initial] *JAA*

---

 

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 14 OF 17)**

Ai Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E
Property Address: *US Highway 50, Dublin, CA  94568*                                                                                     Date: *December 4, 2024*

**38. MEDIATION:**

**A.** The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. The mediation shall be conducted through the C.A.R. Real Estate Mediation Center for Consumers (**www.consumermediation.org**) or through any other mediation provider or service mutually agreed to by the Parties. The Parties **also agree to mediate any disputes or claims with Agents(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Agent.** Mediation fees, if any, shall be divided equally among the Parties involved, and shall be recoverable under the prevailing party attorney fees clause. If, for any dispute or claim to which this paragraph applies, any Party **(i)** commences an action without first attempting to resolve the matter through mediation, or **(ii)** before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

**B.** **ADDITIONAL MEDIATION TERMS: (i) Exclusions from this mediation agreement are specified in paragraph 39B; (ii) The obligation to mediate does not preclude the right of either Party to seek a preservation of rights under paragraph 39C; and (iii) Agent's rights and obligations are further specified in paragraph 39D.**

---

**39. ARBITRATION OF DISPUTES:**

**A.** **The Parties agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Agents(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Agent. The arbitration shall be conducted through any arbitration provider or service mutually agreed to by the Parties. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of transactional real estate Law experience, unless the Parties mutually agree to a different arbitrator. Enforcement of, and any motion to compel arbitration pursuant to, this agreement to arbitrate shall be governed by the procedural rules of the Federal Arbitration Act, and not the California Arbitration Act, notwithstanding any language seemingly to the contrary in this Agreement. The Parties shall have the right to discovery in accordance with Code of Civil Procedure § 1283.05. The arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction.**

**B.** **EXCLUSIONS: The following matters are excluded from mediation and arbitration: (i) Any matter that is within the jurisdiction of a probate, small claims or bankruptcy court; (ii) an unlawful detainer action; and (iii) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code § 2985.**

**C.** **PRESERVATION OF ACTIONS: The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, provided the filing party concurrent with, or immediately after such filing, makes a request to the court for a stay of litigation pending any applicable mediation or arbitration proceeding; or (iii) the filing of a mechanic's lien.**

**D.** **AGENTS: Agents shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Agents(s) participating in mediation or arbitration shall not be deemed a party to this Agreement.**

**E.** **"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**

**"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

Buyer's Initials _*AH*_ / _*TB*_          Seller's Initials _*GWd*_ / _*Jdd*_

---



**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 15 OF 17)**

At Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: *US Highway 50, Dublin, CA  94568*                                                      Date: *December 4, 2024*

**40. OFFER**

**A. EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless by the date and time specified in **paragraph 3C**, the offer is Signed by Seller and a Copy of the Signed offer is Delivered to Buyer or Buyer's Authorized Agent. **Seller has no obligation to respond to an offer made.**

**B.** ☐ **ENTITY BUYERS: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

(1) One or more Buyers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

(2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 36** for additional terms.

(3) The name(s) of the Legally Authorized Signer(s) is/are: _____,_____.

(4) A. If a trust, identify Buyer as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).

B. If Property is sold under the jurisdiction of a probate court, identify Buyer as executor or administrator, or by a simplified probate name (John Doe, executor, or Estate (or Conservatorship) of John Doe).

(5) The following is the full name of the entity (if a trust, enter the complete trust name; if under probate, enter full name of the estate, including case #): _____

**C.** The VLPA has 17 pages. Buyer acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

**D. BUYER SIGNATURE(S):**

(Signature) By, *Ali Hussain*                                                                      Date: 12/04/2024
Printed name of BUYER: *Ali Hussain*
☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
(Signature) By, *Tejvinder Bhatia*                                                                  Date: 12/04/2024
Printed name of BUYER: *Tejvinder Bhatia*
☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

**41. ACCEPTANCE**

**A. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement and authorizes Agent to Deliver a Signed Copy to Buyer.

**Seller's acceptance is subject to the attached Counter Offer or Back-Up Offer Addendum, or both, checked below.** Seller shall return and include the entire agreement with any response.

☐ **Seller Counter Offer** (C.A.R. Form SCO or SMCO)
☐ **Back-Up Offer Addendum** (C.A.R. Form BUO)

**B.** ☐ **ENTITY SELLERS: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure form (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

(1) One or more Sellers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

(2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 36** for additional terms.

(3) The name(s) of the Legally Authorized Signer(s) is/are: _____,_____.

(4) A. If a trust, identify Seller as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).

B. If Property is sold under the jurisdiction of a probate court, identify Seller as executor or administrator, or by a simplified probate name (John Doe, executor, or Estate (or Conservatorship) of John Doe).

(5) The following is the full name of the entity (if a trust, enter the complete trust name; if under probate, enter full name of the estate, including case #): _____

**C.** The VLPA has 17 pages. Seller acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

**SELLER SIGNATURE(S):**

(Signature) By, *Gregory W. Alameda*                                                              Date: Dec 4, 2024
Printed name of SELLER: Gregory W. Alameda
☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
(Signature) By, *Julia A. Alameda*                                                                Date: Dec 4, 2024
Printed name of SELLER: Julia A. Alameda
☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

---

**OFFER NOT ACCEPTED:** _____/_____ No Counter Offer is being made. This offer was not accepted by Seller _____ (date)
                              Seller's Initials

---

VLPA REVISED 7/24 (PAGE 16 OF 17)

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 16 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com    Us Highway 50,

Docusign Envelope ID: C67B8EDF-2A2B-48B9-B4C8-58B089AA386E

Property Address: US Highway 50, Dublin, CA 94568 _____ Date: **December 4, 2024**

**REAL ESTATE BROKERS SECTION:**
1. **Real Estate Agents are not parties to the Agreement between Buyer and Seller.**
2. **Agency relationships are confirmed as stated in paragraph 2.**
3. **Presentation of Offer:** Pursuant to the National Association of REALTORS® Standard of Practice 1-7, if Buyer's Agent makes a written request, Seller's Agent shall confirm in writing that this offer has been presented to Seller.
4. **Agents' Signatures and designated electronic delivery address:**

A.  Buyer's Brokerage Firm **Redfin** _____ DRE Lic. # **01521930**
    By _Zumana Calcuttawala_    **Zumana Calcuttawala** DRE Lic. # **01960845**    Date 12/04/2024
    By _____ DRE Lic. # _____ Date _____
    Address **2033 Gateway Pl #110**    City **San Jose**    State **CA** Zip **95110**
    Email **zumanawct@gmail.com** _____ Phone # _____
    ☐ More than one agent from the same firm represents Buyer. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
    ☐ More than one brokerage firm represents Buyer. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.
    **Designated Electronic Delivery Address(es): Email above or** _____
    ☐ **Attached DEDA:** If Parties elect to have an alternative Delivery method, such method may be indicated on C.A.R. Form DEDA.

B.  Seller's Brokerage Firm **WR Properties** _____ DRE Lic. # **01248834**
    By _____    **Jeffrey Carter** DRE Lic. # **01238627**    Date Dec 4, 2024
    By _____ DRE Lic. # _____ Date _____
    Address _____ City _____ State _____ Zip _____
    Email _____ Phone # _____
    ☐ More than one agent from the same firm represents Seller. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
    ☐ More than one brokerage firm represents Seller. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.
    **Designated Electronic Delivery Address(es) (To be filled out by Seller's Agent): Email above or** _____
    ☐ **Attached DEDA:** If Parties elect to have an alternative Delivery method, such method may be indicated on C.A.R. Form DEDA.

Buyer's Initials _AH_ / _TB_    Seller's Initials _GWA_ / _JAA_

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☒ a deposit in the amount of $ **18,000.00** ), Counter Offer numbers _____ and _____, and agrees to act as Escrow Holder subject to **paragraph 22** of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.
Escrow Holder is advised by _____ that the date of Acceptance of the Agreement is _____
Escrow Holder Orange Coast Title, PX̶X̶X̶X̶X̶X̶X̶ Danville    Escrow # 24300462
By    Alicia Huntziker    Date 12/05/2024
Address    588 San Ramon Valley Blvd, Danville
Phone/Fax/E-mail    925.621.8300 aliciah@octitle.com
Escrow Holder has the following license number # 4844-7
☐ Department of Financial Protection and Innovation, ☒ Department of Insurance, ☐ Department of Real Estate.

**PRESENTATION OF OFFER:** _____ / _____ Seller's Brokerage Firm presented this offer to Seller on Dec 4, 2024 (date).
Broker or Designee Initials

© 2024, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC. *a subsidiary of the California Association of REALTORS®*



**VLPA REVISED 7/24 (PAGE 17 OF 17)**

**VACANT LAND PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (VLPA PAGE 17 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    Us Highway 50,

# EXHIBIT 2

Docusign Envelope ID: 136084B8-2E9E-4831-8739-7727779DE35A

**CALIFORNIA ASSOCIATION OF REALTORS®**

# ASSIGNMENT OF AGREEMENT AMENDMENT
### (C.A.R. Form AOAA, Revised 6/24)

The following terms and conditions are hereby incorporated in and made a part of the Purchase Agreement, OR ☐ Other
_____, dated  **_12/04/2024_**  ("Agreement"),
on property known as  **_US Highway 50 , Dublin, CA  94568_** _____ ("Property"),
between _____ **_Ali Hussain, Tejvinder Bhatia_** _____ ("Buyer")
and _____ **_Gregory W. Alameda, Julia A. Alameda_** _____ ("Seller").
Buyer and Seller are referred to as the "Parties."

In consideration, of the covenants contained herein, Buyer hereby assigns to assignee and assignee accepts the assignment, subject to Seller's consent if required by the Agreement, of all or a partial interest of Buyer's right, title, and interest under the Agreement, including without limitation, the right, title, and interest in any deposit or down payment upon the following terms and conditions:

1. **PARTIAL OR TOTAL ASSIGNMENT:**
   A. ☐ **Partial Assignment (Adding a buyer):** Buyer is adding the Assignee(s) named below to the Agreement and granting to such Assignee(s) a partial interest in the Agreement.
   OR B. ☒ **Total Assignment (New buyer(s) replaces all original Buyers):** Buyer is assigning all of Buyer's interest in the Agreement to the Assignee(s) named below.
   OR C. ☐ **Other Assignment (Replacing a Buyer and at least one original Buyer remaining; or Deleting a Buyer):**
   _____ (buyer(s) being removed) is assigning all of that buyer(s) interest in the Agreement to the new or remaining buyer(s) (Assignee(s)) named below.
   D. **Assignee(s) Names:** _____ **_Good Guys Ventures LLC_** _____, _____ .
   E. ☒ Assignee is Buyer's own trust or a wholly-owned entity of Buyer.
2. **PRIOR DOCUMENTS:** Assignee shall initial the first page of each document and Deliver to Seller all of the transaction documents previously approved by Buyer including, but not limited to, all contract documents, inspection reports, pamphlets, advisories, and disclosures ("Prior Documents") within the time specified below. Unless Otherwise Agreed, Assignee acknowledges that all time frames in the Agreement remain the same and no additional time shall be provided for any matter including, but not limited to, investigation, review of documents, or Close Of Escrow.
   A. **DELIVERY OF PRIOR DOCUMENTS:**
      (1) **Prior Documents already delivered to Assignee:** Assignee acknowledges that Buyer has already provided Assignee all Prior Documents.
      OR (2) ☐ **Prior Documents not yet delivered to Assignee:** Seller shall Deliver to Buyer and Assignee a seller-signed copy of this Assignment of Agreement Addendum ("Assignment"). Upon receipt of the seller-signed Assignment, Buyer shall immediately Deliver to Assignee all Prior Documents.
   B. **PREQUALIFICATION OR PREAPPROVAL OF ASSIGNEES:** Assignee has been prequalified or preapproved by Buyer's lender as per the Agreement and a copy is attached. This requirement applies even if **1E** is checked.
   C. **TIME TO RETURN ASSIGNEE-INITIALED PRIOR DOCUMENTS:**
      (1) Initialed copies of all Prior Documents are attached to this Assignment.
      OR (2) ☐ Assignee shall Deliver initialed copies of all Prior Documents to Seller within **3 (or ____ ) Days** after Seller Delivers to Assignee a Signed Copy of this Assignment.
      (3) If **1E** is checked, Delivery and Return of Prior Documents is not required because Assignee is Buyer's own trust or a wholly-owned entity of Buyer.
   D. **EFFECT OF FAILURE TO RETURN OR ATTACH DOCUMENTS:** Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Assignment and the Assignment shall have no further force and effect:
      (1) **Prior Documents:** If Assignee does not Deliver to Seller all Prior Documents within the time specified in **2C**.
      (2) **Prequalification or preapproval:** If Assignee does not attach same prequalification or preapproval from Buyer's lender as required by Buyer.
3. **CONSIDERATION FOR ASSIGNMENT:**
   A. Buyer has not received and will not receive any monetary consideration from Assignee for this Assignment.
   OR B. ☐ Buyer has received or will receive consideration from Assignee in the amount of $_____ (or ☐ _____ ).
4. Assignee represents for the benefit of Seller that Assignee ratifies and approves as Assignee's own acts all prior approvals and acts of Buyer pursuant to the Agreement up to and including the date of this Assignment.
5. Assignee assumes and agrees to perform and observe all of the obligations and covenants of Buyer in the Agreement to be performed after the date of this Assignment.
6. Buyer acknowledges and agrees that, notwithstanding Seller's agreement to this Assignment, Buyer is not released from any obligations or covenants under the Agreement.
7. Other terms: _____

© 2024, California Association of REALTORS®, Inc.
**AOAA REVISED 6/24 (PAGE 1 OF 2)**

**ASSIGNMENT OF AGREEMENT AMENDMENT (AOAA PAGE 1 OF 2)**

Redfin, 655 Montgomery Street, #1500 San Francisco CA 94111    Phone: (530)988-8575    Fax:    US Highway 50
Cheryl Rugh    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com

Docusign Envelope ID: 136084B8-2E9E-4831-8739-7727779DE35A

8. Without releasing Buyer from any obligations or covenants under the Agreement and preserving all rights and remedies under the Agreement, in consideration of the covenants contained herein, Seller consents to the foregoing Assignment.

9. The parties acknowledge and agree that they have been advised to review this Assignment with a qualified California real estate attorney and/or accountant prior to signing this Assignment. The Brokers and agents make no representation as to the propriety, adequacy, legality or tax consequences of this Assignment.

**By signing below, Buyer assigns the Agreement to Assignee, and Assignee accepts the assignment from Buyer, and Buyer and Assignee, acknowledge that each has read, understands, received a copy of and agrees to the terms of this Assignment of Agreement Amendment.**

| | |
|---|---|
| _Ali Hussain_ | 12/12/2024 |
| **Buyer** Ali Hussain | **Date** |
| _TEJINDER BHATIA_ | 12/12/2024 |
| **Buyer** Tejinder Bhatia | **Date** |

[X] **ENTITY ASSIGNEE: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

(1) One or more Assignees is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or [ ] Other: _____ .

(2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not for him/herself as an individual. The Legally Authorized Signer **(i)** represents that the entity for which that person is acting already exists and is in good standing to do business in California and **(ii)** shall Deliver to Seller and Escrow Holder, within **3 Days** of signing, evidence of authority to act in that capacity.

(3) The name(s) of the Legally Authorized Signer(s) is: _____ **Ali Hussain** _____, _____ .

(4) A. If a trust, identify Assignee as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).

B. If Property is sold under the jurisdiction of a probate court, identify Assignee as executor or administrator, or by a simplified probate name (John Doe, executor, or Estate (or Conservatorship) of John Doe).

(5) The following is the full name of the entity (if a trust, enter the complete trust name; if under probate, enter full name of the estate, including case #): **Good Guys Ventures LLC** _____

**ASSIGNEE SIGNATURE(S):**

(Signature) By, _____ Date: 12/12/2024

Printed name of ASSIGNEE: **Good Guys Ventures LLC**

[X] Printed Name of Legally Authorized Signer: _____ **Ali Hussain** _____ Title, if applicable: _____ **Manager**

(Signature) By, _____ Date: _____

Printed name of ASSIGNEE: _____

[ ] Printed Name of Legally Authorized Signer: _____ Title, if applicable: _____

[ ] IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA)

**By signing below, Seller consents to the assignment and acknowledges that Seller has read, understands, received a copy of and agrees to the terms of this Assignment of Agreement Amendment.**

| | |
|---|---|
| _Gregory W. Alameda_ | Dec 14, 2024 |
| **Seller** Gregory W. Alameda | **Date** |
| _Julia A. Alameda_ | Dec 14, 2024 |
| **Seller** Julia A. Alameda | **Date** |

| |
|---|
| ASSIGNMENT **NOT ACCEPTED:** _____/_____. This assignment was **NOT** accepted by Seller on _____ (date). |
| Seller Initials |
| **Seller's right to disapprove an assignment, if applicable, is established in the Agreement.** |

© 2024, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.
Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC. a subsidiary of the California Association of REALTORS®



**AOAA REVISED 6/24 (PAGE 2 OF 2)**

**ASSIGNMENT OF AGREEMENT AMENDMENT (AOAA PAGE 2 OF 2)**

# EXHIBIT 3

**RECORDING REQUESTED BY:**
Orange Coast Title Company of Northern California

**When Recorded Mail Document To:**
Good Guys Ventures LLC, a California limited liability company
7399 Colton Hills Dr
Dublin, CA 94568

**Escrow No.:** 521-BAY-24300462-07 - AH
**Title No.:** 521-2421949-63

APN: 985-0027-003

2024155525        12/23/2024 09:09 AM        3 PGS



OFFICIAL RECORDS OF ALAMEDA COUNTY
MELISSA WILK, CLERK-RECORDER
RECORDING FEES: $30.00
TOTAL TAX: $660.00
COUNTY TAX PORTION: $330.00
CITY TAX PORTION: $330.00

# ELECTRONICALLY RECORDED

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# GRANT DEED

**The undersigned grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX is: $660.00**

☐  This transfer is exempt from the documentary transfer tax.
☑  **The documentary transfer tax is computed on:**
    ☑  computed on full value of property conveyed, or
    ☐  computed on full value less value of liens or encumbrances remaining at time of sale,
☑  The property is located in the City of Dublin

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,**

Gregory W. Alameda and Julia A. Alameda, husband and wife as community property with right of survivorship

**hereby GRANT(S) to**

Good Guys Ventures LLC, a California limited liability company

**the following described real property in the County of Alameda, State of California:**

See Exhibit A attached hereto and made a part hereof.

Commonly known as:  US Highway 50 W, Dublin, CA 94568

> Exempt from the fee per GC 27388.1(a) (2);
> This document is subject to Documentary
> Transfer Tax.

**MAIL TAX STATEMENTS AS DIRECTED ABOVE**

Page 1 of 2

APN: 985-0027-003
Dated: December 18, 2024

_Gregory Alameda_
Gregory W. Alameda

_Julia Alameda_
Julia A. Alameda

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of ~~California~~ Texas
County of ___Harris___

On ___12/18/2024___ before me, ___Minerva Hollingsworth___, Notary Public, personally appeared ___Gregory and Julia Alameda___ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Minerva Hollingsworth_ (Seal)

MINERVA HOLLINGSWORTH
Notary Public, State of Texas
Comm. Expires 07-26-2027
Notary ID 12321365

MAIL TAX STATEMENTS AS DIRECTED ABOVE

Order No. 521-2421949-63

## Exhibit "A"

Commencing at a point on the Southwesterly line of that certain parcel of land Described as Parcel 1 in the deed from Earl W. Smith Development Organization, El Al, to W. L. Maynard and Jean S. Maynard, as recorded on Reel 3309, at Image 867, Alameda County records, said point being referred to as Station "A" in said Deed; thence from said point of commencement, South 50° 00' 00" West, 56.00 feet to the true point of beginning of this description; thence from said true point of beginning, South 50° 00' 00" West, 48.92 feet to a point on the Arc of a curve having a radius of 700.00 feet, the center of which curve bears South 14° 36' 07" West; thence Northwesterly along the arc of said curve having a Radius of 700.00 feet, through a central angle of 17° 32' 02". An arc distance of 214.22 feet; thence along the arc of a reverse curve to the right, having a radius of 120.00 feet, through a central angle of 84° 57' 21", an arc distance of 177.93 feet; thence tangent to said curve, North 02° 06'44" East, 72.35 feet; thence along the arc of a tangent curve to the right, having a Radius of 40.00 feet, through a central angle of 93° 46' 50", an arc distance of 65.47 feet; thence along the arc of a compound curve to the right, having a radius of 222.00 feet, through a central angle of 44° 06' 26" an arc distance of 170.90 feet; thence tangent to said curve, South 40° 00' 00" East, 238.99 feet to the true point of beginning.

Assessor's Parcel Numbers(s): 985-0027-003

Page 8